NEW YORK STATE DEPARTMENT
OF FINANCIAL SERVICES

In the Matter of

DEUTSCHE BANK AG,
DEUTSCHE BANK AG NEW YORK BRANCH

## CONSENT ORDER UNDER
## NEW YORK BANKING LAW §§ 39 and 44

The New York State Department of Financial Services (the "Department"), Deutsche Bank AG ("Deutsche Bank" or the "Bank"), and Deutsche Bank AG New York Branch ("New York Branch") stipulate that:

**WHEREAS** Deutsche Bank is a major international banking institution with more than 98,000 employees and total assets exceeding $1.9 trillion;

**WHEREAS** Deutsche Bank operates a foreign bank branch in New York State that is licensed, supervised, and regulated by the Department;

**WHEREAS** Deutsche Bank Trust Company Americas ("DBTCA"), a subsidiary of Deutsche Bank AG, is chartered pursuant to Article III of the New York Banking Law and subject to supervision and regulation by the Department;

**WHEREAS** during the relevant time period, both the New York Branch and DBTCA (collectively, "Deutsche Bank New York") conducted correspondent banking and U.S. dollar clearing activities, as explained more fully below;

**WHEREAS** from at least 1999 through 2006, Deutsche Bank used non-transparent methods and practices to conduct more than 27,200 U.S. dollar clearing transactions[1] valued at over $10.86 billion on behalf of Iranian, Libyan, Syrian, Burmese, and Sudanese financial institutions and other entities subject to U.S. economic sanctions, including entities on the Specially Designated Nationals ("SDN") List of the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC");[2]

**WHEREAS** the Bank effectively concealed the relationship of a sanctioned or possibly-sanctioned party to the transactions by knowingly processing these non-transparent transactions using methods such as (i) removing from SWIFT payment messages[3] information that identified an underlying party to the transaction as an entity subject to U.S. sanctions; (ii) using non-transparent cover payments, which enabled the bank to send payment messages to the U.S. that did not include information identifying an underlying party to the transactions as a possibly-sanctioned entity; and (iii) including notes or code words, or instructing customers to include notes or code words, in payment messages to ensure bank staff employed special processing to hide any sanctions relationship before sending the payments to the U.S.;

**WHEREAS** by knowingly processing transactions involving sanctioned entities using non-transparent methods, Deutsche Bank failed to maintain accurate records as to those transactions, subverted Deutsche Bank New York's and correspondent banks' controls designed

---

[1] U.S. dollar clearing is the process by which U.S. dollar-denominated payments between counterparties are made through a bank in the United States.

[2] Deutsche Bank reported, employing extrapolation methodology to the transaction messages reviewed, that over 600 of those transactions valued at more than $38 million were illegal under various U.S. Sanctions and other programs.

[3] The Society of Worldwide Interbank Financial Telecommunications, or SWIFT, provides an international network through which banks exchange electronic wire transfer messages. SWIFT messages contain various informational fields.

to detect possibly illegal transactions, and prevented effective review by regulators and other authorities;

**WHEREAS** Deutsche Bank's conduct ran counter to U.S. foreign policy and national security interests, constituted violations of New York and federal laws and regulations, and raises substantial safety and soundness concerns;

**NOW THEREFORE**, to resolve this matter without further proceedings pursuant to the Superintendent's authority under Sections 39 and 44 of the Banking Law, the Department and Deutsche Bank agree to the following:

**Factual Background**

Use of Wire Stripping and Non-Transparent Cover Payments to Disguise Transactions

1. Starting at least in 1999, Bank employees recognized that U.S. sanctions rules, which applied at that time or over the course of subsequent years to Iranian, Syrian, Libyan, Burmese, or Sudanese customers or to customers who were listed on OFAC's SDN list, would pose problems for U.S. dollar payments sent to or cleared through the U.S., including clearing done through Deutsche Bank New York. Payments involving sanctioned entities were subject to additional scrutiny and might be delayed, rejected, or frozen in the United States. In order to facilitate what it saw as "lucrative" U.S. dollar business for sanctioned customers, Bank employees developed and employed several processes to handle dollar payments in non-transparent ways that circumvented the controls designed to detect potentially-problematic payments.

2. One method was wire stripping, or alteration of the information included on the payment message. Bank staff in overseas offices handling Message Type 103 serial payment messages, or MT103s, removed information indicating a connection to a sanctioned entity before

the payment was passed along to the correspondent bank in the U.S.[4] With any potentially-problematic information removed (or, as was done in some cases, replaced with innocuous information, such as showing the bank itself as the originator), the payment message did not raise red flags in any filtering systems or trigger any additional scrutiny or blocking that otherwise would have occurred if the true details were included.

3. A second method was the use of non-transparent cover payments. The cover payment method involved splitting an incoming MT103 message into two message streams: an MT103, which included all details, sent directly to the beneficiary's bank, and a second message, an MT202, which did not include details about the underlying parties to the transaction, sent to Deutsche Bank New York or another correspondent clearing bank in the U.S. In this way, no details that would have suggested a sanctions connection and triggered additional delay, blocking, or freezing of the transactions were included in the payment message sent to the U.S. bank.

4. Bank employees recognized that these handling processes were necessary in order to evade the sanctions-related protections and controls of Deutsche Bank New York and other correspondents. For example, a relationship manager who handled significant business for Iranian, Libyan, and Syrian customers explained the need for special measures as follows, in a 2003 email to colleagues: The Bank employs "specific precautionary measures that require a great deal of expertise" because "[i]f we make a mistake, the amounts to be paid could be frozen in the USA and/or DB's business interests in the USA could be damaged." Or as the Assistant Vice President who oversaw payments processing explained to a colleague who inquired about

---

[4] A serial payment consisted of a SWIFT MT103 sent from the ordering customer's bank through a correspondent bank and on to the beneficiary's bank.

Iranian payments, the Bank needed to employ "the tricks and cunning of MT103 and MT202" because of the U.S. sanctions restrictions otherwise applicable to sanctions-related payments.

5. Therefore, as explained in another email summing up the process for handling Iran-related payments, the Bank's preferred method was to process a payment using the cover payment method, and when that was not possible, "we will arrange for the order to be dropped . . . into a further repair queue, where the references to the principal will then be eliminated."

6. As new sanctioned customers were brought into the fold, or as newly-enacted U.S. sanctions programs affected existing customers, these processes were extended so as to ensure that payments did not encounter U.S.-based sanctions problems. For example, when Bank staff learned that possible new U.S. sanctions might affect certain Syrian customers, they discussed how Syrian payment orders "must be 'anonymised' in the same way as orders from Iran or Libya, i.e. coverage without mention of Syria can be directed via USA and the order is made directly to the beneficiary's bank."

7. On some occasions, payments that were rejected by Deutsche Bank New York due to a suspected sanctions connection were simply resubmitted to a different U.S. correspondent by the overseas office. Alternatively, some payments that were rejected in the U.S. when they were sent as MT103 serial payments (which included details about the underlying parties) were then resubmitted as MT202 cover payments – in other words, since the information included on the more detailed message caused the rejection, the overseas office simply sent the payment again using the less transparent method.

8. The special processing that the Bank used to handle sanctioned payments was anything but business as usual; it required manual intervention to identify and process the

payments that needed "repair" so as to avoid triggering any sanctions-related suspicions in the U.S. Indeed, on occasion, customers whose payments received this special processing questioned the extra fees the bank was charging for the manual processing. They were told that this is what was necessary in order to circumvent the U.S.-based sanctions controls.

9. The Bank instituted a series of policies starting in 2006 to end these practices and wind down business with U.S.-sanctioned entities. However, some instances of resubmitting rejected payments or processing sanctions-related payments through New York persisted even after the formal policies were instituted.

Bank Staff Coordinated With Sanctioned Customers to Conceal True Details About Payments

10. Bank relationship managers and other employees worked with the Bank's sanctioned customers in the process of concealing the details about their payments from U.S. correspondents.

11. During site visits, in emails, and during phone calls, clients were instructed to include special notes or code words in their payment messages that would trigger special handling by the bank before the payment was sent to the United States. Sanctioned customers were told "it is essential for you to continue to include [the note] 'Do not mention our bank's name…' in MT103 payments that may involve the USA. [That note] ensures that the payments are reviewed prior to sending. Otherwise it is possible that the [payment] instruction would be sent immediately to the USA with your full details. . . . [This process] is a direct result of the US sanctions." Customers, in turn, included notes in free-text fields of SWIFT messages such as "Please do not mention our bank's name or SWIFT code in any msg sent via USA," "PLS DON'T MENTION THE NAME OF BANK SADERAT IRAN OR IRAN IN USA," or "THE NAME BANK MELLI OR MARKAZI SHOULD NOT BE MENTIONED . . . IMPORTANT:

6

NO IRANIAN NAMES TO BE MENTIONED WHEN MAKING PAYMENT TO NEW YORK."

12. But the Bank did not rely on the customer notes and code words alone; the Bank's payments processing staff were instructed to be on the lookout for any payment involving a sanctioned entity and ensure that no name or other information that might arouse sanctions-related suspicions was sent to the U.S. correspondents, even if the customer failed to include a special note to that effect.

13. In fact, the Bank's "OFAC-safe" handling processes and its experience in handling sanctions-related payments were selling points when soliciting new business from customers subject to U.S. sanctions. On one occasion, a relationship manager visiting a Syrian bank during a time when the U.S. was considering instituting certain Syrian sanctions pitched Deutsche Bank's "OFAC-safe vehicles," and when the client mentioned possibly splitting its business among several Asia-based banks, the relationship manager "highlighted that the Asian banks in general are not very familiar with OFAC procedures [and] [a]sked them to consider who their friends will be in the longer run, DB or Asian banks." In another instance, after Deutsche Bank staff responded to a client inquiry about handling U.S. dollar payments relating to Iran and Syria with a favorable "OFAC safe" solution, the Bank relationship manager reported that the client was so pleased that it "used the opportunity to enquire whether we can also do USD payments into Burma/Myanmar."

<u>Deutsche Bank's Practice Was Widespread and Formalized, But Care Was Taken Not to Make Too Much "Noise" About the Practice or the Business the Bank Was Handling</u>

14. The practice of non-transparent payment processing was not isolated or limited to a specific relationship manager or small group of staff. Rather, Bank employees in many

7

overseas offices, in different business divisions, and with various levels of seniority were actively involved or knew about it.

15. In addition, some evidence indicates that at least one member of the Bank's Management Board was kept apprised about and approved of the Bank's business dealings with customers subject to U.S. sanctions.

16. Certain non-U.S. employees, especially those who managed relationships with a high number of Iranian, Libyan, or Syrian clients or who regularly processed U.S. dollar payments for sanctioned customers, were considered experts in the bank's "OFAC-safe" handling procedures. They regularly educated colleagues in other branches or in other divisions outside the U.S. about handling U.S. dollar payments.

17. Moreover, the Bank disseminated formal and informal written instructions emphasizing the need for utmost care to ensure that no sanctions-related information was included in U.S.-bound payment messages and setting out the various methods to use when processing sanctions-related payments.

18. For example, Deutsche Bank staff told investigators that during the earlier part of the relevant time period, an internal customer database included notes for certain sanctioned customers indicating that their name must not be referenced in payment messages sent to the U.S.

19. Later, Bank payments processing employees prepared a training manual for newly-hired payments staff in an overseas office. The manual included a section titled "US Embargo Payments" that explained how to handle payments with a sanctions connection. An early draft included a warning, in bolded text: "Special attention has to be given to orders in which countries/institutes with embargos are involved. Banks under embargo of the US (e.g.,

8

Iranian banks) must not be displayed in any order to [Deutsche Bank New York] or any other bank with American origin as the danger exists that the amount will be frozen in the USA."

20. A revised version of the payments manual admonished that payments from Iran and Syria "have to be treated with caution as [ ] the payment gets released from the queue; there is a probability that the funds will be frozen by the Federal Reserve thereby causing financial and reputation loss for the Bank." A later version of the manual noted that the payment message might include key words such as "Embargo" or "Do not pay via US," but it also cautioned employees that code words might not necessarily be present. In any event, non-U.S. employees were instructed that information linking a customer to a U.S. sanctions program must not be displayed in any message sent to Deutsche Bank New York or any other American bank. The preference, they were told, was to send two messages (that is, to use the cover payment method), but if that was not possible, they must reformat the message so that it gets routed for additional repair and reformatting "in such a way that the Embargo names are not visible to the receiving US banks." The manual included computer screenshots illustrating how these problematic messages might appear and how to handle them.

21. Moreover, less formal instructions were disseminated to certain staff via email throughout the relevant time period. In one email chain regarding possible recruitment of a new customer with Libyan connections, Bank staff were cautioned to "please be careful in regard to the US, since it does violate OFAC," and were told, "please do not mention OFAC names in the subject line of e-mails!" In another instance, when certain U.S. regulations against a Syrian bank were imposed in 2004, relevant employees were told: "Let us be very careful while effecting USD denominated transaction[s] with Syria. In case we have to effect any USD denominated remittance to Syria, please ensure that name of Syria should not appear in the message."

22. At the same time, Bank staff took care to avoid publicizing details about their non-transparent payments handling, both within and outside the bank. Employees recognized the legal and reputational concerns and acted to keep the payment handling methods – and indeed the fact of the bank's business dealings with sanctioned entities in general – on a need-to-know basis.

23. For example, one non-U.S. relationship manager who asked for advice about U.S. dollar processing was told, "Please be informed that any info on OFAC-safe business patterns (THAT DB does it and HOW DB does it) is strictly confidential information. Compliance does not want us to distribute such info to third parties, and forbids us explicitly to do so in any written or electronic form." In another email, a senior compliance executive with oversight of this area told a non-U.S. relationship manager who was asking about the possibility of doing business with a Syrian customer that Compliance "agreed to do business on a low key level without public announcements etc." Later, when that relationship manager was offering advice to another non-U.S. colleague about assisting a client who needed to make and receive U.S. dollar payments with Iranian and Syrian connections, he cautioned his colleague: "As usual, let's not revert to the client in writing due to the reputational risk involved if the e-mail goes to wrong places. Someone should call [the client] and tell them orally and ensure that the conversation is not taped. . . . Let's also keep this e-mail strictly on a 'need-know' basis, no need to spread the news in [Deutsche Bank's Asian offices about] what we do under OFAC scenarios."

24. Around the same time, that same relationship manager told another non-U.S. colleague: "Please note that while DB is prepared to do business with Syria, we obviously have sizeable business interests in the US, too, which DB wants to protect. So any Syrian transaction should be treated STRICTLY confidential and should involve any colleagues on a 'Must-Know'

10

basis only! . . . [W]e do not want to create any publicity or other 'noise' in the markets or media."

25. In addition, while one of the main purposes of the nontransparent practices was to keep the Bank's U.S. staff in the dark about the sanctions connections of the payments they were processing, Deutsche Bank New York staff occasionally raised objections to the Bank's business relationship with U.S.-sanctioned parties based on U.S. law. Their European colleagues, however, did nothing to stop the practice but instead redoubled their efforts to hide the details from their American colleagues. For example, a relationship manager who did significant business with Iranian and Syrian customers complained to his boss that colleagues in the Middle East "participated in a major conference call with senior management of [Deutsche Bank New York] and provided an overview of DB's account activities with Syria outside the U.S. Senior management of [Deutsche Bank New York] complained strongly to DB Frankfurt that they see this as a breach of law." The relationship manager viewed this incident not as a prompt to re-examine the bank's Syrian business, however, but rather as indicating a need to better train the non-U.S. staff who handle the "very lucrative" Syrian and Iranian business to ensure such disclosures do not occur in the future.

## Violations of Law and Regulations

26. Deutsche Bank failed to maintain or make available at Deutsche Bank New York true and accurate books, accounts, and records reflecting all transactions and actions, in violation of New York Banking Law §§ 104 and 200-c.

27. Deutsche Bank employees knowingly made and caused to be made false entries in the Bank's books, reports, and statements and omitted and caused to be omitted therefrom true entries of material particular pertaining to the U.S. dollar clearing business of the Bank at

11

Deutsche Bank New York, with the intent to deceive the Superintendent and examiners of the Department and representatives of other U.S. regulatory agencies that were lawfully appointed to examine the Bank's condition and affairs, in violation of 3 NYCRR § 3.1.

28. Deutsche Bank failed to submit a report to the Superintendent immediately upon discovering fraud, dishonesty, making of false entries and omission of true entries, or other misconduct, whether or not a criminal offense, in violation of 3 NYCRR § 300.1.

**Settlement Provisions**

**Monetary Payment:**

29. Deutsche Bank shall pay a civil monetary penalty pursuant to Banking Law § 44 to the Department in the amount of $200,000,000. The Bank shall pay the entire amount within ten days of executing this Consent Order. Deutsche Bank agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any U.S. federal, state, or local tax, directly or indirectly, for any portion of the civil monetary penalty paid pursuant to this Consent Order.

**Independent Monitor**

30. The Bank[5] and the Department agree to retain an independent monitor for one year to conduct a comprehensive review of the Bank's existing BSA/AML and OFAC sanctions compliance programs, policies, and procedures in place at the Bank that pertain to or affect activities conducted by or through Deutsche Bank New York.

31. The monitor will be selected by the Department in the exercise of its sole discretion, and will report directly to the Department.

---

[5] For purposes of Paragraphs 30-40, "the Bank" shall mean Deutsche Bank AG, Deutsche Bank AG New York Branch, and DBTCA.

32. Among other things, the monitor will review and report on:

   a. The elements of the Bank's corporate governance that contributed to or facilitated the improper conduct discussed in this Consent Order and that permitted it to go on, relevant changes or reforms to its corporate governance that the Bank has made since the time of the conduct discussed in this Consent Order, and whether those changes or reforms are likely to significantly enhance the Bank's BSA/AML and OFAC compliance going forward;

   b. The thoroughness and comprehensiveness of the Bank's current global BSA/AML and OFAC compliance program;

   c. The organizational structure, management oversight, and reporting lines that are relevant to BSA/AML and OFAC compliance, and an assessment of the staffing of the BSA/AML and OFAC compliance teams, including the duties, responsibilities, authority, and competence of officers or employees responsible for the Bank's compliance with laws and regulations pertaining to BSA/AML or OFAC compliance;

   d. The propriety, reasonableness, and adequacy of any proposed, planned, or recently-instituted changes to the Bank's BSA/AML and OFAC compliance programs;

   e. Any corrective measures necessary to address identified weaknesses or deficiencies in the Bank's corporate governance or its global BSA/AML and OFAC compliance program.

33. The Bank agrees that it will fully cooperate with the monitor and support its work by, among other things, providing the monitor with access to all relevant personnel, consultants

and third-party service providers, files, reports, or records, whether located in New York, Germany, or elsewhere, consistent with applicable law.

34.     Within forty-five days of receiving the monitor's preliminary written report on its findings, the Bank will submit to the Department a written plan to improve and enhance the current global BSA/AML and OFAC compliance program that pertains to or affects activities conducted by or through Deutsche Bank New York, incorporating any relevant corrective measures identified in the monitor's report (the "Action Plan").

35.     The Action Plan will, if required, provide recommendations for enhanced internal controls and updates or revisions to current policies, procedures, and processes in order to ensure full compliance with all applicable provisions of the BSA and related rules and regulations, OFAC requirements and regulations, and the provisions of this Consent Order.  If so provided by the monitor, and upon written consent of the Department, the Bank will commence implementation of the monitor's recommendations.

36.     Within forty-five days of receiving the monitor's preliminary written report of findings, the Bank will submit to the Department a written plan to improve and enhance management oversight of BSA/AML and OFAC compliance programs, policies, and procedures now in place at the Bank that pertain to or affect activities conducted by or through Deutsche Bank New York, incorporating any relevant corrective measures identified in the monitor's report (the "Management Oversight Plan").

37.     The Management Oversight Plan will address relevant matters identified in the monitor's written report of findings and provide a sustainable management oversight framework. Upon written consent from the Department, the Bank will commence implementation of the changes.

38. The monitor will thereafter oversee the implementation of any corrective measures undertaken pursuant to the Action Plan and Management Oversight Plan.

39. Finally, the monitor will assess the Bank's compliance with its corrective measures and will submit subsequent progress reports and a final report to the Department and the Bank, at intervals to be determined by the Department. The Department may, in its sole discretion, extend any reporting deadline set forth in this section.

40. The term of the monitor's engagement will extend for one year from the date of the formal engagement. Any dispute as to the scope of the monitor's authority or mandate will be resolved by the Department in the exercise of its sole discretion, after appropriate consultation with the Bank and the monitor.

**Termination of Employees:**

41. While several of the Bank employees who were centrally involved in the improper conduct discussed in this Consent Order no longer work at the Bank, several such employees do remain employed by the Bank.

42. The Department orders Deutsche Bank to take all steps necessary to terminate the following employees, who played central roles in the improper conduct discussed in this Consent Order: a managing director in Global Transactions Banking who was assigned the code number 24; a managing director in Operations who was assigned the code number 325; a director in Operations who was assigned the code number 7; a director in Corporate Banking and Securities who was assigned the code number 11; a vice president in Global Transactions Banking who was assigned the code number 1; and a vice president and relationship manager who was assigned the code number 30. If, after Deutsche Bank has taken whatever action is necessary to terminate these employees, a judicial or regulatory determination or order is issued finding that such action

15

is not possible under German law, then Deutsche Bank shall ensure, consistent with applicable law, that these employees are not allowed to hold or assume any duties, responsibilities, or activities involving compliance, U.S. dollar payments, or any matter relating to U.S. operations.

43.     With respect to the employees who were assigned code numbers 26, 28, and 32, Deutsche Bank shall ensure, consistent with applicable law, that these employees are not allowed to hold or assume any duties, responsibilities, or activities involving compliance, U.S. dollar payments, or any matter relating to U.S. operations.

44.     The Department also orders Deutsche Bank to refrain from ever rehiring for any full-time, part-time, or consulting position the following employees, who played central roles in the conduct discussed in this Consent Order but who previously left the Bank:  the employees who were assigned the code numbers 15, 20, 29, 34, 35, 37, 71, 75, 80, and 124.

**Breach of Consent Order:**

45.     In the event that the Department believes Deutsche Bank to be in material breach of the Consent Order, the Department will provide written notice to Deutsche Bank, and the Bank must, within ten business days of receiving such notice, or on a later date if so determined in the Department's sole discretion, appear before the Department to demonstrate that no material breach has occurred or, to the extent pertinent, that the breach is not material or has been cured.

46.     The parties understand and agree that Deutsche Bank's failure to make the required showing within the designated time period shall be presumptive evidence of the Bank's breach.  Upon a finding that Deutsche Bank has breached this Consent Order, the Department has all the remedies available to it under New York Banking and Financial Services Law and may use any evidence available to the Department in any ensuing hearings, notices, or orders.

**Waiver of Rights:**

47. The parties understand and agree that no provision of this Consent Order is subject to review in any court or tribunal outside the Department.

**Parties Bound by the Consent Order:**

48. This Consent Order is binding on the Department and Deutsche Bank, as well as any successors and assigns that are under the Department's supervisory authority. But this Consent Order does not bind any federal or other state agency or any law enforcement authority.

49. No further action will be taken by the Department against Deutsche Bank for the conduct set forth in the Consent Order, provided that the Bank complies with the terms of the Consent Order.

50. Notwithstanding any other provision in this Consent Order, however, the Department may undertake additional action against Deutsche Bank for transactions or conduct that the Bank did not disclose to the Department in the written materials the Bank submitted to the Department in connection with this matter.

**Notices:**

51. All notices or communications regarding this Consent Order shall be sent to:

For the Department:

    James Caputo
    Jared Elosta
    New York State Department of Financial Services
    One State Street
    New York, NY 10004

For Deutsche Bank:

Christof von Dryander
Deputy General Counsel
Deutsche Bank AG
Taunusanlage 12
60325 Frankfurt Am Main, Germany

Alan Vinegrad
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018

**Miscellaneous:**

52.　Each provision of this Consent Order shall remain effective and enforceable until stayed, modified, suspended, or terminated by the Department.

53.　No promise, assurance, representation, or understanding other than those contained in this Consent Order has been made to induce any party to agree to the provisions of the Consent Order.

**IN WITNESS WHEREOF**, the parties have caused this Consent Order to be signed this third day of November, 2015.

DEUTSCHE BANK AG

By: _____
CHRISTOF VON DRYANDER
Deputy General Counsel

By: _____
MATHIAS OTTO
Deputy General Counsel

NEW YORK STATE DEPARTMENT OF
FINANCIAL SERVICES

By: _____
ANTHONY J. ALBANESE
Acting Superintendent of Financial Services

DEUTSCHE BANK AG NEW YORK BRANCH

By: _____
STEVEN REICH
General Counsel – Americas

By: _____
DAVID LEVINE
Managing Director, Legal