IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CHARLES SHAFFER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| -v- | ) | Case No. 3:16-cv-497 |
| | ) | |
| DEUTSCHE BANK AG, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT DEUTSCHE BANK AG'S
MOTION TO DISMISS**

HEPLERBROOM LLC                     COVINGTON & BURLING LLP
130 N. Main St.                          One CityCenter
P.O. Box 510                             850 Tenth St., NW
Edwardsville, IL 62025                   Washington, DC 20001
(618) 656-0184                           (202) 662-6000

*Attorneys for Deutsche Bank AG*

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

     A.     Statutory Framework ...................................................................... 3

     B.     Plaintiffs' Allegations .................................................................... 4

STANDARD OF REVIEW .............................................................................................. 7

ARGUMENT .................................................................................................................. 7

I.     The Complaint Fails To Allege Proximate Cause. ............................................ 7

II.     The Complaint Is Based On A Flawed Conspiracy Theory Of Liability. ......... 14

     A.     Conspiracy Liability Is Unavailable Under Section 2333. ................... 15

     B.     Plaintiffs Fail To Plausibly Allege That Deutsche Bank Intended To Commit The Offense Of Material Support To Terrorists. ................... 16

III.     The Complaint Fails To Plausibly Allege That Deutsche Bank Acted With An Objective Terroristic Intent. ............................................................................ 18

CONCLUSION ............................................................................................................... 20

i

# TABLE OF AUTHORITIES

CASES                                                                    Page

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...............................................................................19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...............................................................................19

*Boim v. Holy Land Found. for Relief and Dev.*,
    549 F.3d 685 (7th Cir. 2008) (en banc) ........................................ *passim*

*Burrage v. United States*,
    134 S. Ct. 881 (2014) .........................................................................13, 14

*Felland v. Clifton*,
    682 F.3d 665 (7th Cir. 2012) ...................................................................8

*Flannery v. Recording Indus. Ass'n of America*,
    354 F.3d 632 (7th Cir. 2004) ...................................................................5

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 474 (E.D.N.Y. 2012) ...................................................11

*Kaplan v. Al Jazeera*,
    No. 10 Civ. 5298, 2011 WL 2314783 (S.D.N.Y. June 7, 2011)............20

*Lexmark Int'l Inc. v. Static Control Components Inc.*,
    134 S. Ct. 1377 (2014).............................................................................13

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013).......................................................................4

*Linde v. Arab Bank, PLC*,
    944 F. Supp. 2d 215 (E.D.N.Y. 2013) ...................................................15

*Mastafa v. Chevron Corp.*,
    770 F.3d 170 (2d Cir. 2014).....................................................................19

*O'Neill v. Al Rajhi Bank*,
    714 F.3d 118 (2d Cir. 2013).................................................................9, 10

*Paroline v. United States*,
    134 S. Ct. 1710 (2014).............................................................................14

*Roberts v. City of Chicago*,
    817 F.3d 561 (7th Cir. 2016) ...................................................................7

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) ............................................................................. *passim*

*Stansell v. BGP, Inc.*,
    No. 8:09–cv–2501–T–30AEP, 2011 WL 1296881 (M.D. Fla. Mar. 31, 2011) ...................... 20

*Strauss v. Credit Lyonnais, SA*,
    925 F. Supp. 2d 414 (E.D.N.Y. 2013) ................................................................ 10

*Stutts v. De Dietrich Group*,
    No. 03-CV-4058 (ILG), 2006 WL 1867060 (E.D.N.Y. June 30, 2006) ........................ 11, 19

*Terenkian v. Republic of Iraq*,
    694 F.3d 1122 (9th Cir. 2012) ........................................................................... 7

*uBID, Inc. v. GoDaddy Group, Inc.*,
    623 F.3d 421 (7th Cir. 2010) ............................................................................. 7

*United States v. Hills*,
    618 F.3d 619 (7th Cir. 2010) ........................................................................... 17

*United States v. James*,
    540 F.3d 702 (7th Cir. 2008) ........................................................................... 17

*United States v. Sklena*,
    692 F.3d 725 (7th Cir. 2012) ........................................................................... 18

*Univ. of Tex. S.W. Med. Ctr. v. Nassar*,
    133 S. Ct. 2517 (2013) .................................................................................. 13

*Weiss v. Nat'l Westminster Bank PLC*,
    768 F.3d 202 (2d Cir. 2014) ............................................................................ 18

**STATUTES**

18 U.S.C. § 2331 ...................................................................................... 3, 16 18

18 U.S.C. § 2333 ....................................................................................... *passim*

18 U.S.C. § 2339A ..................................................................................... *passim*

18 U.S.C. § 2339B ..................................................................................... *passim*

**OTHER AUTHORITIES**

73 Fed. Reg. 66541 (Nov. 10, 2008) ....................................................................... 5

Carol E. Lee & Jay Solomon, *U.S. Encourages Firms to Make Deals With Iran in Bid to Cement Nuclear Deal*, Wall Street Journal, June 23, 2016, http://tinyurl.com/WSJIranDeals ............................................................................14

Jackie Northam, *Lifting Sanctions Will Release $100 Billion To Iran.  Then What?*, NPR, July 16, 2015, http://tinyurl.com/Iran100billion................................................14

Press Release, Department of the Treasury, Major Iranian Shipping Company Designated for Proliferation Activity (Sept. 10, 2008), http://tinyurl.com/TreasIRISL ............................................................................12

## INTRODUCTION

The bombing attacks in Iraq that killed U.S. soldier David Schaefer and wounded U.S. soldier Charles James Shaffer were heinous acts—conduct that Deutsche Bank AG ("Deutsche Bank") unequivocally condemns.  But Deutsche Bank, a German global banking and financial services company, is not among the unnamed "terror operatives" that allegedly targeted Coalition Forces during the Iraq war.  Nor is Deutsche Bank connected in any way to the Lebanese terrorist organization Hezbollah or the division of the Iranian Revolutionary Guard that allegedly provided funding and training to these "terror operatives" in Iraq.  Nor is Deutsche Bank one of the state-owned Iranian banks that allegedly facilitated the flow of Iranian support to Hezbollah and the Revolutionary Guard.

Instead, the complaint alleges that Deutsche Bank processed U.S.-dollar transactions involving Iranian banks, during a time in which the United States had imposed restrictions on activities with Iran.  Separately, those banks provided services to a broad range of their own customers that allegedly included certain Iran-supported terrorist organizations, which in turn allegedly supplied the Iraqi "operatives," which in turn perpetrated certain attacks on American soldiers in Iraq (though not necessarily these attacks).  On this basis, Plaintiffs assert that Deutsche Bank itself committed an "act of international terrorism" under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331, and that the battlefield injuries to these U.S. soldiers were "by reason of" that act of international terrorism, 18 U.S.C. § 2333, so as to entitle Plaintiffs to treble damages.

No court has recognized such a claim.  Plaintiffs candidly label their theory "material support to Iran," *e.g.*, Compl. ¶ 240: they seek to hold Deutsche Bank responsible not because it committed a terrorist attack, or even because it provided "material support" to a terrorist organization that carried out an attack, but because it allegedly performed services for a *state* that

1

separately supports terrorists. This Court should not be the first to adopt such a sweeping theory of ATA liability, under which anyone who provides a service to Iran may be liable to any victim of terrorists with ties to that country. The Complaint should be dismissed on three separate grounds.

*First*, Plaintiffs fail to plead non-conclusory facts showing that Plaintiffs' injuries were proximately caused by Deutsche Bank. Case law construing the ATA establishes a clear line: material support *to a terrorist* may proximately cause the injury of victims of that terrorist, but material support to a *state*, even one that sponsors terrorism, does not. Indeed, one Court of Appeals has squarely held—under a causal chain *less* attenuated than what Plaintiffs plead here—that supplying funds to Iran, even in violation of sanctions laws, and even with knowledge that Iran could use those funds to finance terrorism, does not trigger ATA liability. *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013). Plaintiffs' inability to establish proximate cause requires dismissal both for lack of personal jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6).

*Second*, participation in the supposed "conspiracy" of which Deutsche Bank is alleged to have been a part does not, as a matter of law, constitute an "act of international terrorism" under the ATA. The Seventh Circuit has explicitly held that the ATA does not permit claims of secondary liability, *Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 689 (7th Cir. 2008) (en banc), and Plaintiffs' conspiracy theory is plainly a claim of secondary liability. Even if that flaw could be overcome, Plaintiffs' claims fail because they do not and cannot plead a critical element of the conspiracy: actual intent to engage in the offense—providing material support to terrorists—that was the supposed object of the conspiracy.

*Third*, Plaintiffs do not plead facts showing that Deutsche Bank's allegedly non-transparent banking practices "appear to have been intended" to achieve a terroristic purpose of intimidating civilians or coercing governments, without which "there is no international terrorist act within the meaning of section 2331(1)." *Boim*, 549 F.3d at 699.  Plaintiffs' recital of this element of their cause of action is not only conclusory and utterly implausible, it is flatly contradicted by the Consent Order they incorporate into their Complaint.

## BACKGROUND

### A.  Statutory Framework

The ATA is largely comprised of criminal prohibitions relating to terrorism, including provisions targeting the provision of material support for terrorists.  18 U.S.C. §§ 2339A, 2339B. Section 2333(a) of the ATA, however, creates a civil cause of action for U.S. nationals "injured . . . by reason of an act of international terrorism."  18 U.S.C. § 2333(a).  This cause of action incorporates the definition of "international terrorism" in 18 U.S.C. § 2331.  That definition limits the scope of terrorism to particular acts—"violent acts" and "acts dangerous to human life" that violate criminal laws.  *Id.* § 2331(1)(A).  It further requires that the act "appear to be intended" to cause particular terrorist goals—including "intimidat[ing] or coerc[ing] a civilian population" and "influenc[ing] the policy of a government by intimidation or coercion."  *Id.* § 2331(1)(B).

A Section 2333 claim by a U.S. national thus consists of three basic elements.  First, the plaintiff must allege that the defendant directly committed an act of international terrorism as defined in Section 2331; it is not sufficient to allege that the defendant "assist[ed] in an act of international terrorism."  *Boim*, 549 F.3d at 689.  Second, to allege the commission of an act of international terrorism, the plaintiff must allege facts showing that the defendant's actions "appear[ed] to be intended" to achieve a terroristic purpose, such as intimidating a civilian

population or coercing a government.  18 U.S.C. § 2331(1).  Third, the plaintiff must allege facts

showing that he or she was injured "by reason of" the defendant's act of international terrorism.

18 U.S.C. § 2333(a).

### B.     Plaintiffs' Allegations

The Complaint is premised on an alleged conspiracy among the Islamic Republic of Iran

("Iran"), the Islamic Revolutionary Guard Corps ("IRGC"), Iran's "banking agents" (including

Bank Saderat, Bank Melli, and the Central Bank of Iran), the Islamic Republic of Iran Shipping

Lines ("IRISL"), and "various Western financial institutions," including Deutsche Bank.  Compl.

¶¶ 1, 139.  Plaintiffs describe the purported conspiracy as a scheme to "[c]onceal[] Iran's

financial activities and transactions from detection, scrutiny, or monitoring by U.S. regulators,

law enforcement, and/or depository institutions."  Compl. ¶ 141.[1]

Plaintiffs allege that Deutsche Bank participated in this conspiracy by providing U.S.

dollar-denominated "correspondent banking" services to Iranian bank customers.  *Id* ¶¶ 143,

178-97; Compl. Ex. A at 1.[2]  They claim that when dealing with sanctioned countries, including

Iran, Deutsche Bank omitted or altered certain identifying information in payment messages in

---

[1] A separate group of plaintiffs, represented by the same counsel, has sued several other banks (HSBC Holdings PLC, HSBC Bank PLC, HSBC Bank Middle East Limited, HSBC Bank USA, N.A., Barclays Bank PLC, Standard Chartered Bank, The Royal Bank of Scotland N.V., Credit Suisse AG, Commerzbank AG, and Bank Saderat PLC), alleging a materially identical "conspiracy."  *See Freeman v. HSBC Holdings Plc*, No. 14-cv-6601 (E.D.N.Y.).  Motions to dismiss are currently pending.

[2] "Correspondent banking" involves the use of wire transfer instructions to facilitate transfers from an account in one bank to an account in another bank.  Intermediary banks with a presence in the United States often provide clearing services for U.S. dollar-denominated transactions, when the banks at either end of the transaction do not have direct relationships with each other. *See generally Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 166 (2d Cir. 2013) (describing international correspondent banking); Compl. Ex. A at 1 n.1 ("U.S. dollar clearing is the process by which U.S. dollar-denominated payments between counterparties are made through a bank in the United States.").

order to avoid U.S. scrutiny of the transactions.  Compl. ¶¶  178-97.  Plaintiffs refer to this

practice as "stripping" the transactions.  *Id.* ¶ 143.

As Plaintiffs concede, before November 2008, certain dollar-clearing transactions for

Iranian banks were permitted by the Office of Foreign Assets Control's ("OFAC") "U-Turn

Exemption" to Iran sanctions.  Compl. ¶¶ 121-22; 73 Fed. Reg. 66541 (Nov. 10, 2008).  Bank

Saderat was permitted to benefit from U-Turn transactions until September 2006; Bank Melli

and the Central Bank of Iran were likewise permitted to benefit from such transactions until

October 2007.  Compl. ¶¶ 209, 223.  In 2006, Deutsche Bank "instituted a series of policies" to

end the alleged "stripping" practices.  Compl. Ex. A ¶ 9.[3]

Thus, during Deutsche Bank's participation in the alleged "conspiracy," it was not

necessarily unlawful to process transactions benefitting the Iranian banks mentioned by

Plaintiffs.  Plaintiffs do not identify any of these transactions as actually violating sanctions laws.

In fact, the Federal Reserve found (in an order referenced in the Complaint, ¶ 200) that Deutsche

Bank's banking practices, although allegedly non-transparent, resulted only in "intermittent

violations of OFAC [sanctions] Regulations."  *Matter of Deutsche Bank AG*, Order, No. 15-034-

B-FB (Bd. Gov. Fed. Res. Sys. Nov. 4, 2015), *available at* http://tinyurl.com/FedDBAG.

Plaintiffs nonetheless allege that Deutsche Bank's banking practices helped "Iran and its agents

. . . hid[e] the volume of financial transactions that they succeeded in illegally clearing through

---

[3] Plaintiffs make conclusory allegations that Deutsche Bank "agreed to continue participating in
the Conspiracy" later than 2006, including by entering into unspecified "financing arrangements"
with the National Iranian Oil Company ("NIOC") and others.  Compl. ¶ 202.  Nowhere does the
Complaint identify NIOC as a member of the conspiracy.  Moreover, because Plaintiffs
incorporate the Consent Order into their Complaint (*see id.* ¶ 201 & Ex. A), they may not
contradict its recognition that Deutsche Bank instituted policies to end the alleged banking
practices in 2006.  *See Flannery v. Recording Indus. Ass'n of America*, 354 F.3d 632, 638 (7th
Cir. 2004) ("[W]hen a document contradicts a complaint to which it is attached, the document's
facts or allegations trump those in the complaint.").

the United States in U.S. dollars."  Compl. ¶ 145.  Deutsche Bank has entered into settlements with the New York State Department of Financial Services and the Board of Governors of the Federal Reserve System relating to "non-transparent methods and practices" to clear transactions on behalf of certain sanctioned countries, including Iran.  *Id.* ¶¶ 200-02, Compl. Ex. A at 2.

The Complaint separately alleges that the Iranian government sponsors terrorists.  Compl. ¶¶ 46-49.  Specifically, Plaintiffs allege that the Iranian banks, which have significant legitimate operations worldwide (*see id.* ¶¶ 205-08, 233), also provide "crucial banking services" to the Islamic Revolutionary Guard Corp's "Qods Force" ("IRGC-QF"), as well as the Lebanese terrorist group Hezbollah.  *Id.* ¶¶ 171, 168.  These groups, in turn, allegedly trained or supported other terrorist groups operating in Iraq, which the Complaint refers to as "Special Groups."  *Id.* ¶ 79.  These "Special Groups" allegedly targeted U.S. service members in Iraq.  *Id.* ¶ 91.  The Complaint alleges that Plaintiff Charles Shaffer was injured in September 2008, and that David Schaefer, son of Plaintiff Rhonda Kemper, was killed in May 2009, by explosive devices.  *Id.*. ¶¶ 14, 28.

The Complaint is notable for what it does *not* allege.  Although the Complaint alleges that the devices used in the attacks at issue were manufactured by Iran and had been provided to "Iranian-funded and -trained terror operatives in Iraq" (*id.*), there are no specific allegations as to who placed or detonated the device used in either attack.  Neither does the Complaint allege that Deutsche Bank transacted any business with the IRGC, the IRGC-QF, Hezbollah, or Iraqi "Special Groups."  Plaintiffs also do not allege that Deutsche Bank's dollar-clearing transactions were used to fund any of those groups.  Instead, Plaintiffs allege that the purported conspiracy provided "ease and efficiency" for Iran's funding of terrorist organizations, and that without it Iran could not have transferred the same "volume" of funds to terrorists, or "exploit[] the U-Turn

exemption" to the "degree" that it did.  Compl. ¶¶ 135, 152.  While Plaintiffs make a conclusory allegation that Deutsche Bank's actions "appear to have been intended" to "intimidate or coerce the civilian population of the United States" and "influence" its policy (*id.* ¶ 255), the Consent Order they attach to the Complaint says no such thing, stating only that Deutsche Bank's employees were motivated by the "lucrative" nature of the dollar-clearing business.  Compl. Ex. A ¶ 1.

## STANDARD OF REVIEW

"To survive a motion to dismiss, the complaint must 'state a claim to relief that is plausible on its face.'"  *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The complaint must do more than recite the elements of a cause of action in a conclusory fashion."  *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The same standard applies to determining whether Plaintiffs have adequately pleaded the existence of personal jurisdiction.  *See uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 423-24 (7th Cir. 2010); *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012).

## ARGUMENT

**I.    The Complaint Fails To Allege Proximate Cause.**

To state a claim under the ATA, a plaintiff must allege injury to a U.S. national "by reason of" the defendant's commission of an "act of international terrorism."  18 U.S.C. § 2333.  Here, Plaintiffs do not allege that Deutsche Bank was involved in any terrorist attack, or even that it provided material support to a terrorist organization that carried out such an attack.  Instead, as the Complaint repeatedly avers, Plaintiffs' theory is that Deutsche Bank is responsible because, by participating in transactions with Iranian banks, it provided "material support *to Iran*."  Compl. ¶ 240 (emphasis added); *see also* ¶¶ 241, 245, 248, 249, 250, 251, 253, 260, 262, 264, 266, 268, 270.  Plaintiffs' allegations fall far short of establishing that Deutsche Bank

proximately caused their injuries, a defect that requires dismissal both for lack of personal jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6).[4]

Material support to a foreign state, even one that is recognized as a state-sponsor of terrorism, does not proximately cause every injury inflicted by every terrorist organization associated with that state. The Second Circuit, confronting a materially identical legal theory and affirming the dismissal of a complaint, held exactly that. In *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), the plaintiffs alleged that UBS had "facilitated" terrorist attacks by Hamas and Hezbollah by "furnishing United States currency to Iran" in violation of U.S. sanctions laws. *Id.* at 84-85. Much like Plaintiffs here, they alleged that the bank "knew full well" that the cash it provided "would be used to cause and facilitate terrorist attacks by Iranian-sponsored terrorist organizations," because "receipt of cash dollars from Iran" would "substantially increase[]" the terrorists' ability to carry out attacks. *Id.* at 87, 97.

The Second Circuit held that this was not enough. "The fact that the transfers were made to a state sponsor of terrorism of course made it more likely that the moneys would be used for terrorism than if the transfers were to a state that did not sponsor terrorism." *Id.* at 97. Moreover, the Second Circuit was willing to accept that UBS's "transfers increased Iran's ability—and perhaps its readiness—to provide funding to Hizbollah and Hamas." *Id.*

---

[4] To establish personal jurisdiction, Plaintiffs must point to conduct by Deutsche Bank that was "purposely directed" at the United States, *and* show that their injury "arise[s] out of" or "relates to" that conduct. *Felland v. Clifton*, 682 F.3d 665, 676 (7th Cir. 2012). Courts have divided over "how close the causal connection must be," with some courts requiring the U.S.-focused conduct be "the factual *and* proximate cause" of the injury. *Id.* The Seventh Circuit has not definitively resolved this question, but has "suggested" that "a mere 'but for' causal relationship is insufficient to establish the required nexus between a defendant's contacts and the underlying cause of action." *Id.* at 676-77. For the same reasons that Plaintiffs fail to state a claim on the merits, the causal relationship between Deutsche Bank's U.S.-dollar transactions and Plaintiffs' injuries by unnamed operatives in Iraq is far too attenuated to meet the standard for personal jurisdiction, whether that standard is traditional proximate cause or something more "intermediate." *Id.* at 676.

Nonetheless, "Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund." *Id.* The court could not accept that Congress had meant to hold "any provider of U.S. currency to a state sponsor of terrorism . . . strictly liable for injuries subsequently caused by a terrorist organization associated with that state." *Id.* at 96. To state a claim, therefore, plaintiffs had to offer "nonconclusory allegation[s] . . . that plausibly show[] that the moneys UBS transferred to Iran *were in fact sent to Hizbollah or Hamas* or that Iran would have been *unable to fund the attacks* by Hizbollah and Hamas without the cash provided by UBS." *Id.* at 97 (emphasis added). In other words, material support to a state-sponsor of terrorism does not proximately cause terrorist attacks, and does not suffice to state an ATA claim.

The Second Circuit reiterated the need for a non-attenuated connection between the challenged conduct and the actual terrorist attack in *O'Neill v. Al Rajhi Bank*, 714 F.3d 118 (2d Cir. 2013). In *Al Rajhi*, "defendants [were] alleged to have provided funding to purported charity organizations known to support terrorism that, in turn, provided funding to al Qaeda and other terrorist organizations." *Id.* at 124. Those allegations were "plainly insufficient for proximate causation purposes for the same reasons the allegations in *Rothstein* fell short." *Id.* at 124; *see also id.* (banking services provided to organizations affiliated with al Qaeda did not proximately cause the September 11, 2001 attacks).

No court in this Circuit has disagreed with *Rothstein* and *Al Rajhi*, or suggested that Plaintiffs' "material support to Iran" theory could be viable. What the Seventh Circuit has recognized instead is an ATA claim with a much tighter nexus between the defendant and the terror victim than what is alleged here: "a donation *to a terrorist group* that targets Americans outside the United States may violate section 2333." *Boim v. Holy Land Found. for Relief &*

*Dev.*, 549 F.3d 685, 690 (7th Cir. 2008) (en banc) (emphasis added).  *Boim* involved allegations

of "financial support to Hamas," the terrorist organization that carried out attacks on the

plaintiffs.  *Id.* at 688.  Causation was satisfied in this scenario because a contribution to a terrorist

organization "significantly enhance[s] the risk of terrorist acts" *by that terrorist organization*.

*Id.* at 698.

Together, the leading ATA cases draw a clear and sensible line: material support to a

terrorist may proximately cause the injury of that terrorist's victim, but material support to a

*state*, even one that sponsors terrorism, does not.  The key difference is that, as *Boim* found,

writing checks to Hamas "significantly enhance[s] the risk of terrorist acts."  *Boim*, 549 F.3d at

690.  In contrast, as the Second Circuit recognized in *Rothstein*, because Iran has "many

legitimate agencies, operations, and programs to fund," transacting business with Iran does *not*

enhance that risk to such a significant extent.  *Rothstein*, 708 F.3d at 97.  As *Rothstein* observed,

Iran could rely on "its billions of dollars in reserve" to finance terrorism, with or without the

infusion of an additional hundreds of millions of dollars from a Western financial institution.  *Id.*

Other courts have recognized this same distinction between material support to terrorists

(actionable) and alleged material support to state-sponsors (not).  *See Strauss v. Credit Lyonnais,

SA*, 925 F. Supp. 2d 414, 433 (E.D.N.Y. 2013) ("[T]h[e] connection [in *Rothstein*] is more

attenuated than in the instant case, where the money from Defendant was purportedly going

directly to Hamas front-groups, rather than to a government that performs myriad legitimate

functions in addition to allegedly funding terrorist organizations."); *see also Al Rajhi*, 714 F.3d at

124 (distinguishing support to Al Qaeda (actionable) from support to organizations affiliated

with Al Qaeda (not actionable)); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 479-80 (E.D.N.Y.

2012) (plaintiffs stated claim where defendant bank was "alleged to have maintained accounts

for and provided financial services to Hamas, its leaders, and its affiliates"); *Stutts v. De Dietrich Group*, No. 03-CV-4058 (ILG), 2006 WL 1867060, at *4 (E.D.N.Y. June 30, 2006) (banks that issued letters of credit to companies supplying chemicals to Iraq did not proximately cause injuries to U.S. service members from Iraqi chemical weapons).

Following these principles, it is clear that Deutsche Bank's correspondent banking transactions with Iranian banks did not proximately cause Plaintiffs' injuries.  All Plaintiffs can offer are generic allegations about how access to U.S. dollars aided Iran's ability to finance terrorism—precisely what *Rothstein* rejects.  *Compare, e.g.*, Compl. ¶ 172 (alleging that if Deutsche Bank had not helped Iranian banks gain "access to the U.S. 'dollar clearing' system," "Iran's efforts to transfer large sums of U.S. dollars to Hezbollah would have been substantially impaired"), *with Rothstein*, 708 F.3d at 87 (noting allegations that U.S. sanctions "made it difficult for Iran to obtain the large sums of cash dollars needed for the Hizbollah and Hamas operations," and "UBS solved this problem for Iran by illegally providing Iran with hundreds of millions of dollars in cash"); *see also id.* at 84-85, 87 (rejecting allegations that UBS "facilitated" the attacks by "furnishing U.S. currency to Iran," and that it "substantially increased" the ability of terrorist organizations to carry out the attack, as insufficient to plead proximate cause). Nothing in the Complaint connects Deutsche Bank's alleged U.S. dollar-clearing transactions to any terrorist organization in Iraq or elsewhere, let alone to the actual attacks that injured Plaintiffs.

Rather than allege actual connections, Plaintiffs resort to sleight of hand.  At one point, for example, the Complaint refers to "illicit transactions totaling at least $50 million U.S. dollars for the benefit of Hezbollah."  Compl. ¶ 141.  That allegation does not name the parties to those transactions, giving the misleading impression that Deutsche Bank was somehow involved.  *Id.*

¶ 141.  Yet elsewhere the Complaint makes clear that these alleged transactions for the benefit of Hezbollah were performed by Bank Saderat—with *no* alleged involvement by Deutsche Bank. *Id.* ¶¶ 212, 215; *see also id.* ¶¶ 141, 171, 221, 223, 225, 226 (making a similar misleading suggestion concerning $100 million in transfers from Bank Melli to the IRGC-QF, without any allegation that Deutsche Bank was involved in these transactions).  Notwithstanding Plaintiffs' effort to muddy the waters, it is clear that the only transactions they can allege Deutsche Bank participated in involved Iranian financial institutions.  *See also* Compl. Ex. A at 2.  And like the government of Iran itself, it is clear that the relevant Iranian banks had "legitimate" operations. *Rothstein*, 708 F.3d at 97; *see, e.g.*, Compl. ¶ 205 (alleging that Bank Saderat has operations worldwide, including branches in London, Frankfurt, and Paris); *id.* ¶¶ 209, 229 (acknowledging that prior to at least 2006, the Iranian banks were authorized by U.S. regulators to benefit from certain banking transactions).[5]

The role of Iranian banks, among other factors, actually makes Plaintiffs' theory of causation *more* attenuated than the theory rejected in *Rothstein*.  There, UBS allegedly supplied U.S. banknotes directly to the Government of Iran, which allegedly financed Hamas and Hezbollah using U.S. currency, which allegedly carried out the attacks in question.  *Rothstein*, 708 F.3d at 85-87.  The causal chain here is even more indirect.  Here, Deutsche Bank allegedly

---

[5] Plaintiffs also make the vague allegation that Deutsche Bank was "one of several banks" that facilitated payments "on behalf of IRISL."  Compl. ¶ 155.  IRISL, like the Iranian banks, is not a mere terrorist front but has legitimate operations worldwide.  *See id.* ¶ 103 n.2 (IRISL "provides a variety of maritime transport services, including bulk, break-bulk, cargo and containerized shipping").  Moreover, Plaintiffs allege that these payments were "facilitated" after IRISL was listed as a Specially Designated National on September 10, 2008 (*id.* ¶ 155)—which is also after Plaintiff Shaffer was allegedly injured.  *Id.* ¶ 13 (attack on September 1, 2008).  Finally, while Plaintiffs suggest that IRISL was designated due to involvement in terrorism, the Treasury Department press release they cite says nothing about terrorism, but instead describes nuclear proliferation concerns as the basis for sanctioning IRISL.  *See* Press Release, Department of the Treasury, Major Iranian Shipping Company Designated for Proliferation Activity (Sept. 10, 2008), http://tinyurl.com/TreasIRISL.

engaged in U.S. dollar-clearing transactions with Iranian banks. *See, e.g.*, Compl. ¶ 143 (alleged participation in "bank-to-bank transfers" with Iranian banks). Plaintiffs allege that those banks were then separately used by the Iranian government to support Hezbollah and IRGC-QF (among many other global activities). *See, e.g.*, *id.* ¶¶ 1, 171 (alleging that Iran used Iranian "banking agents," which provided "crucial banking services to IRGC-QF"). Hezbollah and IRGC-QF in turn allegedly supported various named and unnamed militias in Iraq. *See, e.g.*, *id.* ¶¶ 57-58 (Iran's alleged reliance on "both Hezbollah and the IRGC" to "foment violence" in Iraq). And finally, *those* groups allegedly attacked U.S. soldiers. *See, e.g.*, *id.* ¶¶ 14, 28 (attacks involving unnamed "terror operatives in Iraq"). The tortuous path from Deutsche Bank's dollar-clearing transactions with Iranian banks to bombing attacks injuring U.S. soldiers on the battlefield Iraq fits no recognizable definition of proximate cause. *See Lexmark Int'l Inc. v. Static Control Components Inc.*, 134 S. Ct. 1377, 1390 (2014) ("alleged harm" must not be "too remote from the defendant's unlawful conduct").[6]

---

[6] There is also plainly no allegation that Deutsche Bank's transactions involving Iranian banks were the "but for" cause of Plaintiffs' injuries. The Seventh Circuit in *Boim* held that the ATA relaxed the need to show but-for causation. *See* 549 F.3d at 695-98. But subsequent Supreme Court decisions hold that "the phrase, 'by reason of,' requires at least a showing of 'but for' causation." *Burrage v. United States*, 134 S. Ct. 881, 889 (2014) (quoting *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 176 (2009)); *see also Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2525-27 (2013) (holding that "because of," which the Court equated to "by reason of," requires but-for causation absent "an indication to the contrary *in the statute itself*" (emphasis added)). *Burrage* specifically rejects the view that "by reason of" can be satisfied through the "less demanding" standard that the act be a "substantial" or "contributing" factor in producing the result. 134 S. Ct. at 890; *cf. Paroline v. United States*, 134 S. Ct. 1710, 1724-25 (2014) (applying an exception to but-for causation, but recognizing the danger of doing so in an "incautious" manner, when it would subject "tens of thousands of offenders" to complete responsibility for injuries they had relatively little role in producing). For the reasons explained above, Plaintiffs' failure to plead proximate cause is sufficient to dismiss the Complaint. The Supreme Court's post-*Boim* decisions make clear, however, that Plaintiffs' inability to plead but-for causation is an additional reason that their claims fail.

This case is different from *Rothstein* in one additional respect: while it was clearly illegal for UBS to provide U.S. currency to the Iranian government, dollar-clearing transactions with the Iranian banks at issue were *legal* for most (if not all) of the time Deutsche Bank participated in the alleged "conspiracy."  *See supra* 4.  Deutsche Bank has accepted responsibility for the lack of *transparency* of its activities involving certain sanctioned countries, but regulators made clear that actual sanctions violations resulting from this conduct were limited, and Plaintiffs fail to identify a single transaction Deutsche Bank allegedly processed involving an Iranian entity that violated U.S. sanctions laws.  *See id.*  To be clear, this Court has no need to ascertain whether any particular transaction was illegal—*Rothstein* held that a bank could not be sued under the ATA for supplying Iran with U.S. currency even though doing so indisputably "violated federal law."  708 F.3d at 96.  But Plaintiffs' attempt to hold Deutsche Bank liable under the facts alleged here illustrates just how sweeping their "material support to Iran" theory is.  They would seemingly have this Court overrule OFAC and impose ATA liability based on transactions that the U.S. Government decided to *permit*.  These far-reaching implications are yet another indication that Plaintiffs' "material support to Iran" theory cannot succeed.[7]

## II.     The Complaint Is Based On A Flawed Conspiracy Theory Of Liability.

Plaintiffs' claims fail for the additional reason that they do not allege Deutsche Bank committed an "act of international terrorism."  18 U.S.C. § 2333(a).  Attempting to dramatically expand the reach of the ATA, Plaintiffs assert that Deutsche Bank's "act of international

---

[7] Indeed, by Plaintiffs' logic, recent actions the U.S. Government has taken to implement the nuclear deal with Iran have foreseeably increased Iran's ability to fund terrorists, and thereby have made the United States itself a "material supporter" of terrorism.  *See, e.g.*, Jackie Northam, *Lifting Sanctions Will Release $100 Billion To Iran.  Then What?*, NPR, July 16, 2015, http://tinyurl.com/Iran100billion; Carol E. Lee & Jay Solomon, *U.S. Encourages Firms to Make Deals With Iran in Bid to Cement Nuclear Deal*, Wall Street Journal, June 23, 2016, http://tinyurl.com/WSJIranDeals.

terrorism" was "conspiring to provide material support" to terrorists in violation of Sections 2339A and 2339B.  Compl. ¶¶ 240, 260.  That theory fails because (i) conspiracy liability is unavailable under Section 2333, and (ii) even if it were, Plaintiffs do not adequately allege the elements of a conspiracy to violate Sections 2339A or 2339B.

### A.      Conspiracy Liability Is Unavailable Under Section 2333.

"Section 2333 does not say that someone who assists in an act of international terrorism is liable."  *Boim*, 549 F.3d at 689.  Because "statutory silence on the subject of secondary liability means there is none," the Seventh Circuit in *Boim* expressly refused "[t]o read secondary liability into section 2333(a)."  *Id.* at 689-90.  Accordingly, there is no basis for Plaintiffs' conspiracy-based theory of civil liability under the ATA.  Indeed, the only court to confront such a theory has squarely rejected it, holding that "§ 2333(a) does not provide for claims for civil conspiracy," and dismissing "all conspiracy claims under the ATA."  *Linde v. Arab Bank, PLC*, 944 F. Supp. 2d 215, 217 (E.D.N.Y. 2013).

Plaintiffs hope to circumvent this rule by characterizing their conspiracy claim as reflecting a *primary* violation of Section 2333(a).  They apparently seek to expand *Boim*'s recognition of "[p]rimary liability in the form of material support to terrorism" as the basis for an ATA claim.  549 F.3d at 691.  *Boim* reached this result "[t]hrough a chain of incorporations by reference": Section 2333 creates a cause of action for "acts of international terrorism"; Section 2331 defines "international terrorism" to include "acts dangerous to human life that are a violation of the criminal laws of the United States"; and "[g]iving money to Hamas" is an act dangerous to human life that violates Section 2339A, the prohibition on material support to terrorists.  *Boim*, 549 F.3d at 690.  Thus, while the Seventh Circuit rejected aiding and abetting liability under Section 2333(a), it held that Congress "has expressly imposed liability on a *class*

of aiders and abettors"—those that have committed the crime of providing material support to terrorists. *Id.* at 692 (emphasis added).

The problem for Plaintiffs is that Deutsche Bank is not in this "class" on whom Congress has imposed liability. The Complaint makes clear that Deutsche Bank is not accused of providing material support to the unnamed terror groups that allegedly carried out the attacks at issue, but rather of conspiring to support *Iran,* which in turn supported those groups. Compl. ¶¶ 240, 260. And the "act dangerous to human life" in this formulation is not "giving money to Hamas" directly, but rather processing U.S.-dollar clearing transactions for Iranian banks. This theory cannot succeed. An alleged conspiracy to provide financial services to a sovereign nation that aids terrorists is not "[p]rimary liability . . . [that] has the character of secondary liability." *Boim*, 549 F.3d at 691. It is *purely* secondary liability, something *Boim* held to be excluded from the ATA's civil cause of action.

### B.   Plaintiffs Fail To Plausibly Allege That Deutsche Bank Intended To Commit The Offense Of Material Support To Terrorists.

Even if "conspiracy to provide material support" (Compl. ¶ 240) were an available theory of liability under section 2333, Plaintiffs have not adequately pleaded it. Plaintiffs' theory is that Deutsche Bank's alleged participation in the "conspiracy" is an "act of international terrorism," because conspiring to provide material support to terrorists is a federal crime dangerous to human life. *See* 18 U.S.C. §§ 2331, 2333, 2339A, 2339B. But to establish that Deutsche Bank committed this conspiracy offense as a predicate to ATA liability, Plaintiffs must plausibly allege the elements of a criminal conspiracy—including that Deutsche Bank "*inten[ded]* to commit the substantive offense" that was the goal of the conspiracy. *United States v. Hills*, 618 F.3d 619, 637 (7th Cir. 2010) (emphasis added). In other words, conspirators must "embrace[] the criminal objective of the conspiracy." *United States v. James*, 540 F.3d 702, 707 (7th Cir.

2008).  To adequately allege Deutsche Bank's knowing participation in a conspiracy to materially support terrorists in violation of Sections 2339A and 2339B, they must plead that Deutsche Bank actually *agreed and intended to commit the offense* of material support to terrorists under those provisions.

Plaintiffs do not and cannot make such an outlandish allegation.  Nowhere does the Complaint claim that Deutsche Bank had any intent to facilitate the provision of material support to terrorists killing U.S. soldiers in Iraq; nor would any such allegation be plausible.  Instead, Plaintiffs allege that Deutsche Bank "shared the common goal" of "helping Iran to transfer billions of dollars through the United States while avoiding detection."  Compl. ¶ 163-64.  Even if "helping Iran to transfer billions of dollars through the United States" violated some other law, *but see supra* 4, it does not meet the elements of the crime of material support to terrorists under Sections 2339A and 2339B.  Thus, even if a conspiracy to violate Sections 2339A and 2339B is actionable under Section 2333 through a chain of incorporations by reference, a key link in that chain—participation in a conspiracy *to violate those provisions*—is not pleaded here.

Rather than allege that Deutsche Bank agreed to engage in the crime of material support to terrorists, Plaintiffs claim that Deutsche Bank "knew" or was "indifferent to the fact" that "provid[ing] Iran with illegal material support would *foreseeably* . . . facilitate hundreds of millions of dollars in payments to the IRGC and Hezbollah through the international financial system."  Compl. ¶ 248 (emphasis added).  Plaintiffs' reliance on what they claim was "foreseeable" fundamentally misunderstands conspiracy law.  They apparently wish to invoke the principle of *Pinkerton* liability that "a conspirator may be liable for foreseeable crimes committed in furtherance of a conspiracy."  *United States v. Sklena*, 692 F.3d 725, 729 (7th Cir. 2012).  But "[b]efore *Pinkerton* liability can be applied, it is of course necessary to show that a

conspiracy existed, that the defendant joined the conspiracy, [and] that the other actor was also part of the conspiracy."  *Id.* (quoting *United States v. Smith*, 223 F.3d 554, 573 (7th Cir. 2000)). To state a claim premised on Deutsche Bank conspiring to provide material support to terrorists, Plaintiffs must plead not just that Iran providing material support to terrorists was foreseeable, but that Deutsche Bank actually agreed and intended to commit that offense.  They have not done so.

III.     **The Complaint Fails To Plausibly Allege That Deutsche Bank Acted With An Objective Terroristic Intent.**

Finally, the Complaint fails to state a claim because it does not plausibly allege that the objective purpose of Deutsche Bank's processing of transactions for Iranian banks was to advance terrorist goals.  A critical element of the ATA's definition of "international terrorism" is that the act "appear to be intended" to, *inter alia*, "intimidate or coerce a civilian population" or "influence the policy of a government by intimidation or coercion."  18 U.S.C. § 2331(1).  *Boim* held that "without such appearance there is no international terrorist act within the meaning of section 2331(1) and hence no violation of section 2333."  549 F.3d at 699; *see also Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014) (describing the requirement that the defendant's action "appear to be intended" to achieve a terrorist purpose as a "definitional requirement" for ATA liability).

The Complaint contains nothing more than conclusory assertions that Deutsche Bank's actions "appear to have been intended to (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations."  Compl. ¶¶ 255, 271.  Such "[t]hreadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Moreover, it is simply implausible to conclude from the Complaint that Deutsche Bank's objective purpose in processing U.S. dollar transactions for Iranian banks was to intimidate the civilian population of the United States, drive U.S. forces out of Iraq, or pursue some other terrorist objective.  *Cf. Mastafa v. Chevron Corp.*, 770 F.3d 170, 194 (2d Cir. 2014) (rejecting "the plausibility of a large international corporation intending . . . [to assist] the Saddam Hussein regime's torture and abuse of Iraqi persons").  To the contrary, the facts incorporated in the Complaint reveal "an obvious alternative explanation," *Twombly*, 550 U.S. at 567: that certain of Deutsche Bank's employees "saw as 'lucrative' U.S. dollar business for sanctioned customers." Compl. Ex. A ¶ 1.  The Court need not view such a profit motive as admirable to recognize the obvious: undertaking this U.S. dollar business does not objectively appear to be motivated by a desire to *intimidate civilians*, *coerce governments*, or pursue other terrorist objectives, much less by any desire to harm Plaintiffs or other U.S. soldiers.

It is one thing to conclude that making charitable "donations to Hamas" betrays an objective intent to achieve terrorist objectives.  *Boim*, 549 F.3d at 694.  Indeed, it is difficult to conceive of a separate political or pecuniary motivation to donate money directly to an organization for which murdering civilians is core to its mission.  But it is a far cry from that set of facts to say that simply engaging in a commercial banking relationship with Iranian banks, even in an allegedly non-transparent manner, shows an objective purpose of intimidation and coercion.  *See, e.g.*, *Stutts*, 2006 WL 1867060, at *3 ("engaging in commercial banking activity" with suppliers of chemicals to Iraq was not "designed to coerce civilians or government entities as required under § 2331"); *Stansell v. BGP, Inc.*, No. 8:09–cv–2501–T–30AEP, 2011 WL

1296881, at *9 (M.D. Fla. Mar. 31, 2011) (payment of protection money to Colombian terrorists to allow defendants to conduct oil exploration "would not lead an objective observer to conclude Defendants intended to achieve any one of the results listed in § 2331(1)(B)"); *Kaplan v. Al Jazeera*, No. 10 Civ. 5298, 2011 WL 2314783, at *6 (S.D.N.Y. June 7, 2011) ("strains credulity" to infer that broadcasting footage of Hezbollah rocket fire had terrorist purpose).

**CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated: July 15, 2016

Respectfully submitted,

/s/ Troy A. Bozarth
Larry E. Hepler, IL #01195603
Troy A. Bozarth, IL #6236748
Beth A. Bauer, IL #6274533
David M. Bays, IL #6318538
HEPLERBROOM LLC
130 N. Main St.
P.O. Box 510
Edwardsville, IL 62025
(618) 656-0184
leh@heplerbroom.com
tab@heplerbroom.com
bab@heplerbroom.com
db2@heplerbroom.com

John E. Hall
David M. Zionts (*Pro Hac Vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., NW
Washington, DC 20001
(202) 662-6000
jhall@cov.com
dzionts@cov.com

Benjamin Robert Salk (*Pro Hac Vice*)
Mark Putnam Gimbel (*Pro Hac Vice*)
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1045
bsalk@cov.com
mgimbel@cov.com

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document with the Clerk of the

Court using CM/ECF on this 15th day of July, 2016.  I also certify that the foregoing document

is being served this day on all counsel of record registered to receive electronic Notices of

Electronic Filing generated by CM/ECF.

/s/ Troy A. Bozarth       