**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| CHARLES J. SHAFFER, et al., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil No. 16-497-MJR-SCW |
| v. | ) | |
| | ) | |
| DEUTSCHE BANK AG, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT**
**DEUTSCHE BANK AG'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P.**
**12(b)(1) and 12(b)(6)**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................ 1

STANDARD OF REVIEW .................................................................................................. 4

FACTUAL ALLEGATIONS ............................................................................................... 5

    A.      The Iranian-Backed Terror Attacks In Iraq ................................................. 5

    B.      The Criminal Conspiracy ............................................................................. 5

ARGUMENT ....................................................................................................................... 9

I.  *Boim III* Recognizes Civil Liability for Conspiring to Violate the Material Support Statutes – 18 U.S.C. § 2339A and 18 U.S.C. § 2339B ...................................................................... 9

    A.      Deutsche Bank Fundamentally Misconstrues *Boim III* ............................ 9

    B.      Plaintiffs Sufficiently Allege the Existence of a Conspiracy to Materially Support and to Conceal Material Support for Terrorism. .................................................... 10

    C.      Plaintiffs Sufficiently Alleged Defendant's State of Mind in Joining the Conspiracy to Materially Support and Conceal Material Support for Terrorism. ...........................11

II.  Plaintiffs Have Sufficiently Pled that Acts Foreseeably Made in Furtherance of the Conspiracy Proximately Caused Their Injuries .................................................. 16

III.  Criminal Violations of the Material Support Statutes Are Acts that Inherently "appear to be intended. . .to intimidate or coerce a civilian population" and Are Acts of International Terrorism ........................................................................................ 19

CONCLUSION .................................................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**

*Abecassis v. Wyatt*
    7 F. Supp. 3d 668 (S.D. Tex. 2014) ................................................................. 20, 21

*Bell Atl. Corp v. Twombly*
    550 U.S. 544 (2007) ...................................................................................... 4

*Boim v. Holy Land Found. for Relief and Dev.*
    549 F.3d 685 (7th Cir. 2008) (en banc) ("*Boim III*") ...................................... passim

*Burrage v. United States*
    134 S. Ct. 881 (2014) ................................................................................... 18

*DT Boring, Inc. v. Chicago Pub. Bldg. Comm'n*
    2016 WL 3580756 (N.D. Ill. 2016) ............................................................... 16

*Geinosky v. City of Chicago*
    675 F.3d 743 (7th Cir. 2012) ....................................................................... 16

*Goldberg v. UBS AG*
    690 F. Supp. 2d 92 (E.D.N.Y. 2010) ........................................................... 20

*Hampton v. Hanrahan*
    600 F.2d 600 (7th Cir. 1979) ....................................................................... 15

*Hoffman-LaRoche, Inc. v. Greenberg*
    447 F.2d 872 (7th Cir. 1971) .................................................................. 14, 15

*In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.("Chiquita")*
    2015 WL 71562 (S.D. Fla. 2015) ................................................................. 18

*In re Terrorist Attacks on Sept. 11, 2001 ("Al Rajhi Bank")*
    714 F.3d 118 (2d Cir. 2013) ........................................................................ 17

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*
    732 F.3d 161 (2d Cir. 2013) .......................................................................... 1

*Linde v. Arab Bank, PLC*
    944 F. Supp. 2d 215 (E.D.N.Y. 2013) ..................................................... 10, 18

*M.C. Van Kampen Trucking, Inc. v. Reliable Truck Parts, Inc.*
    1994 WL 35909 (N.D. Ill. 1994) ................................................................. 16

*Mastafa v. Chevron Corp.*
    770 F.3d 170 (2d Cir. 2014) ........................................................................ 19

*Ocasio v. United States*
    136 S. Ct. 1423 (2016) ............................................................................ 14

*Paroline v. United States*
    134 S. Ct. 1710 (2014) ............................................................................ 18

*Pinkerton v. United States*
    328 U.S. 640 (1946) ................................................................................ 16

*Rothstein v. UBS AG*
    708 F.3d 82 (2d Cir. 2013) ................................................................. 2, 17

*Salinas v. United States*
    522 U.S. 52 (1997) .................................................................................. 14

*Stansell v. BGP, Inc.*
    2011 WL 1296881 (M.D. Fla. 2011) ...................................................... 20

*Strauss v. Credit Lyonnais, S.A.*
    2006 WL 2862704 (E.D.N.Y. 2006) ...................................................... 20

*Stutts v. De Dietrich Grp.*
    2006 WL 1867060 (E.D.N.Y. 2006) ...................................................... 20

*Tamayo v. Blagojevich*
    526 F.3d 1074 (7th Cir. 2008) .................................................................. 4

*U.S. v. Frink*
    912 F.2d 1413 (11th Cir. 1990) .............................................................. 14

*U.S. v. Lechuga*
    994 F.2d 346 (7th Cir. 1993) .................................................................. 11

*U.S. v. Morse*
    851 F.2d 1317 (11th Cir. 1988), ............................................................ 14

*United States v. Cervantes*
    466 F.2d 736 (7th Cir. 1972) .................................................................. 15

*United States v. Consol. Packaging Corp.*
    575 F.2d 117 (7th Cir. 1978) .................................................................. 12

*United States v. Cruse*
    805 F.3d 795 (7th Cir. 2015) .................................................................. 10

*United States v. Diaz*
    864 F.2d 544 (7th Cir. 1988) .................................................................. 16

*United States v. Ferraina*
    19 F.3d 145 (2d Cir. 2002) ................................................................ 12

*United States v. Kehm*
    799 F.2d 354 (7th Cir. 1986) ............................................................. 13

*United States v. Lanza*
    790 F.2d 1015 (2d Cir. 1986) ............................................................ 12

*United States v. McBride*
    724 F.3d 754 (7th Cir. 2013) ........................................................ 12, 15

*United States v. Pisman*
    443 F.3d 912 (7th Cir. 2006) ............................................................. 16

*United States v. Reynolds*
    801 F.2d 952 (7th Cir. 1986) ............................................................. 11

*United States v. Salinas*
    763 F.3d 869 (7th Cir. 2014) ............................................................. 12

*United States v. Sklena*
    692 F.3d 725 (7th Cir. 2012) ............................................................. 16

*Univ. of Tex. S.W. Med. Ctr. v. Nassar*
    133 S. Ct. 2517 (2013) ...................................................................... 18

*Weiss v. National Westminster Bank PLC*
    2016 WL 1305157 (E.D.N.Y. 2016) .................................................... 1

*Wultz v. Islamic Republic of Iran*
    755 F. Supp. 2d 1 (D.D.C. 2010) ....................................................... 20

**Statutes**

18 U.S.C. § 2333 ................................................................................. 1, 10

18 U.S.C. § 2338 ..................................................................................... 1

18 U.S.C. § 2339A ................................................................. 9, 10, 15, 19

18 U.S.C. § 2339B .................................................................... 9, 10, 19

18 U.S.C. § 2331 ............................................................... 12, 19, 20, 21

**Rules**

Fed. R. Civ. P. 12(b)(1) ................................................................................................................ 1

Fed. R. Civ. P. 12(b)(2) ................................................................................................................ 1

Fed. R. Civ. P. 12(b)(6) ................................................................................................................ 1

Fed. R. Civ. P. 12(h)(1)(A) .......................................................................................................... 1

Fed. R. Civ. P. 4(k)(1)(C) ............................................................................................................ 1

Fed. R. Civ. P. 8(a) ....................................................................................................................... 4

**Treatises**

*Restatement (Second) of Torts* § 876(a) .................................................................................... 10

## PRELIMINARY STATEMENT

Both by the order of its arguments and by its reliance on the fact that Deutsche Bank *could* have conducted the majority (but not all) of its transactions on Iran's behalf in a lawful manner under the U.S. government's "U-Turn" Exemption, Defendant's brief ("Def. Mem.") in support of the motion to dismiss pursuant to Rules 12(b)(1)[1] and 12(b)(6) artfully attempts to misdirect the Court.

*First*, Plaintiffs' claims against Deutsche Bank are predicated on conspiracy. If the Bank is right that conspiracy liability is not incorporated by reference in the Anti-Terrorism Act ("ATA"), the Court can dismiss the Complaint in its entirety without reaching any of the Bank's other defenses. Yet the Bank's brief leads with the *other* defenses, relegating this threshold and potentially dispositive conspiracy argument to the end of its brief. It does so, not just because that defense is inconsistent with the holding and language of the controlling case, *Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685 (7th Cir. 2008) (en banc) ("*Boim III*") (language it does not even acknowledge, let alone rebut), but also in order to argue causation as if no conspiracy claim had been made, thus avoiding settled proximate causation standards of conspiracy law that are fatal to that defense.

---

[1]     Plaintiffs' sole claims arise under 18 U.S.C. § 2333(a), which expressly authorizes suit "in any appropriate district court of the United States ...." *See also* 18 U.S.C. § 2338 (giving the federal courts exclusive subject matter jurisdiction). The Rule 12(b)(1) motion should therefore be denied. Although Defendant cites only Rule 12(b)(1) in its motion and again in its brief, Def. Mem. at 2 and 8, it drops a footnote in its brief referring to "personal jurisdiction." Def. Mem. at 8 n.4. Assuming, but not conceding, that Defendant's omission of a Rule 12(b)(2) defense from its motion did not waive it, *see* Fed. R. Civ. P. 12(h)(1)(A), both the Court and Plaintiffs were still entitled to clearer notice of the defense than Defendant's perfunctory footnote. In any case, Defendant's facilitation of billions of dollars in sanctions-evading transactions were all, perforce, directed at, and flowed through, the United States. That was the object of the Conspiracy. No more is necessary to establish personal jurisdiction. *See, e.g.*, *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 172 (2d Cir. 2013) (finding personal jurisdiction for ATA claims against a foreign bank engaged in correspondent banking in the United States and acknowledging that "use of a forum's banking system as part of an allegedly wrongful course of conduct may expose the user to suits seeking redress in that forum when that use is an integral part of the wrongful conduct."); *Weiss v. National Westminster Bank PLC*, 2016 WL 1305157, at *12-17 (E.D.N.Y. 2016) (finding personal jurisdiction for ATA claims over a foreign bank that engaged in correspondent banking in the United States, satisfying Rule 4(k)(1)(C) and minimum contacts test under the Fifth Amendment, here applicable).

*Second*, the Bank's reliance on the fact that some "dollar-clearing transactions for Iranian banks at issue were *legal* for most (if not all) of the time Deutsche Bank participated in the alleged 'conspiracy'" (Def. Mem. at 14, emphasis in original) is meant to exculpate, when, in fact, the Defendant conspired to *evade* the legal avenues for such transactions. The "U-Turn" regulations[2] allowed (for a time) such transactions to fund what the U.S. government then perceived as *legitimate* Iranian operations. *See* Def. Mem. at 12. The Bank mentions this program both to bring its conduct within what it argues is the Second Circuit's safe harbor set forth in *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), for transactions that could support Iran's "many legitimate agencies, operations, and programs," *id*. at 97, and to trivialize the misconduct that led to the $258 million Consent Order it entered into with New York State's Department of Financial Services ("DFS") as nothing more than paperwork errors, slightly compromising the transparency of legal and routine correspondent banking. Def. Mem. at 14. *See also* Def. Mem. at 6, 19 (just "non-transparent methods and practices" for "simply engaging in a commercial banking relationship with Iranian banks").

But the availability of a legal avenue for transactions to fund Iran's legitimate operations unavoidably raises the question: *why didn't Iran and Defendant use it?* Why engage in the

---

[2]     The "U-Turn" Exemption permitted such transfers only if: (1) they were initiated offshore by a *non-Iranian*, non-U.S. financial institution and only passed through the U.S. financial system *en route* to another offshore, *non-Iranian*, non-U.S. financial institution; (2) none of the parties to the transactions had been designated a Specially Designated National ("SDN"); and (3) the transaction was not for the benefit of an SDN. Complaint ¶122. The United States eventually revoked the U-Turn Exemption, explaining:

> Iran's access to the international financial system **enables the Iranian regime to facilitate its support for terrorism** and proliferation. The Iranian regime disguises its involvement in these illicit activities through the use of a wide array of deceptive techniques, specifically designed to avoid suspicion and evade detection by responsible financial institutions and companies. Iran also is finding ways to adapt to existing sanctions, including by turning to non-designated Iranian banks to handle illicit transactions. ¶138. (Emphasis added.)

deliberate, systematic, and comprehensive seven-year "OFAC-safe"[3] (the Bank's own phrase,

¶190) program of concealing its Iranian transactions from U.S. regulators? The only plausible

explanation (or at the very least, *a* plausible explanation, which is the pleading standard Plaintiffs

must meet) is that the Bank knew that the concealment was intended to disguise transactions for

*illegitimate* terrorism and nuclear proliferation by a State Sponsor of Terrorism. No wonder,

then, that the November, 2015 Consent Order finds that from at least 1999 through 2006,

> Deutsche Bank used non-transparent methods and practices to conduct more than
> 27,200 U.S. dollar clearing transactions valued at over $10.86 billion on behalf of
> Iranian, Libyan, Syrian, Burmese, and Sudanese financial institutions and other
> entities subject to U.S. economic sanctions, including entities on the Specially
> Designated Nationals ("SDN") List of the U.S. Treasury Department's Office of
> Foreign Assets Control ("OFAC") …. [Complaint, Exhibit A at 2.]

The Order also cites the Bank's own admission "that over 600 of those transactions valued at

more than $38 million *were illegal* under various U.S. Sanctions and other programs." *Id*. at 2

n.2. (emphasis added). Defendant characterizes the Complaint's description of this conduct as

asking "this Court [to] overrule OFAC and impose ATA liability based on transactions that the

U.S. Government decided to permit." Def. Mem. at 14. But the U.S. government did not "decide

to permit" Deutsche Bank's participation in a criminal conspiracy in which – by its own

admission to the government – it made at least 600 illegal transactions totaling $38 million.[4] That

Deutsche Bank could have used a legal avenue for processing transactions on Iran's behalf only

highlights its criminal knowledge and purpose in not doing so.

Contrary to Defendant's effort to trivialize its misconduct, it did not join a conspiracy

---

[3]   "The Office of Foreign Assets Control (OFAC) of the US Department of the Treasury administers and
enforces economic and trade sanctions based on US foreign policy and national security goals against targeted
foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the
proliferation of weapons of mass destruction, and other threats to the national security, foreign policy or economy of
the United States." https://www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-
Control.aspx

[4]   This merely reflects the number which the Defendant claims to have detected. Only discovery can
determine whether the actual figure is even higher.

with Iran and systematically circumvent U.S. law in order to reduce the paperwork burdens imposed by U.S. regulations. Nor was this a conspiracy "just" to launder money. The Complaint alleges a conspiracy to knowingly provide material support – directly and through intermediate institutions – for Iran's *illegitimate* operations, including terrorism, in which Deutsche Bank deliberately engaged by its otherwise wholly-inexplicable systematic concealment of Iranian transactions from U.S. regulators and law enforcement that foreseeably, and in fact, served to provide support for Iran's terrorism operations. That conspiracy delivered at least $50 million to Hezbollah (a U.S.-designated Foreign Terrorist Organization), at least $100 million to the Islamic Revolutionary Guard Corps ("IRGC") (Iran's prime instrument for supporting terrorism and weapons proliferation), and at least $80 million for the benefit of the Islamic Republic of Iran Shipping Lines ("IRISL") (Iran's prime instrument for transporting weapons).

Whether or not Deutsche Bank's subjective motive was greed (as it shamelessly avows in its brief, Def. Mem. at 7 and 19), its systematic concealment of millions of dollars of transactions for what it knew were illegitimate operations by a State Sponsor of Terrorism in violation of U.S. criminal law also meets the objective "appears-to-be" standard of 18 U.S.C. § 2331(1).

## STANDARD OF REVIEW

Fed. R. Civ. P. 8(a) does not "require heightened fact pleading of specifics." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007). The Complaint's sufficiency is still construed "in the light most favorable to the [P]laintiff[s], accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [their] favor." *Tamayo v. Blagojevich,* 526 F.3d 1074, 1081 (7th Cir. 2008).

## FACTUAL ALLEGATIONS

### A.     THE IRANIAN-BACKED TERROR ATTACKS IN IRAQ

After U.S. combat operations concluded in Iraq in 2003, Iran launched a series of clandestine initiatives to support, train, equip, and finance terrorist operations against United States and Coalition Forces and ordinary Iraqis designed to kidnap, kill, and maim them. ¶¶57-79. Iran was substantially assisted in the execution of its terror campaign in Iraq by Hezbollah, a U.S.-designated Foreign Terrorist Organization ("FTO"). ¶49.

The signature Iranian-manufactured weapon Hezbollah and the IRGC used to kill and maim Americans in Iraq was the Explosively Formed Penetrator ("EFP"), which was more sophisticated than ordinary Improvised Explosive Devices ("IEDs"), and was specifically designed to target American and Coalition armored vehicles, with lethal results. EFPs were also identifiable as weapons of Iranian origin. ¶¶92-102.

Based on ample evidence, the U.S. government and its leaders in Iraq determined that: (1) Iran facilitated, and the IRGC and Hezbollah actively participated in, training Shi'a terrorist groups (herein referred to as "Special Groups") to perpetrate attacks on U.S. and Coalition Forces; and (2) the EFPs used to kill and maim the U.S. and Coalition Forces, including the Plaintiffs and/or their family members, were manufactured by Iran. ¶¶60-71, 90-101, 246.

### B.     THE CRIMINAL CONSPIRACY

During most of the period relevant to the Complaint, the United States provided Iran and banks doing business with Iran and its banks a mechanism to engage in legitimate U.S. dollar-denominated transactions that flowed through the U.S. under the previously referenced "U-Turn" Exemption. This regulation permitted Iranian parties indirect access to U.S. dollar clearing and

settlement[5] for legitimate commercial activities, *provided* the SWIFT messages[6] fully disclosed who the counterparties to the transaction were and they were not earmarked for designated person or entities or other illegal purposes. ¶¶121-123, 209. Therefore, Iran could not use the U-Turn "safe harbor" without providing transparency to U.S. regulators and law enforcement agencies.

To elude such scrutiny, Iran conducted hundreds of *billions* of dollars in funds transfers via Iranian banks (including the Central Bank of Iran, Bank Melli, and Bank Saderat) by means of a criminal conspiracy (the "Conspiracy") in which Deutsche Bank joined and actively participated, to conceal the transfers from U.S. regulators and law enforcement agencies. The Conspiracy allowed Iran's terror-facilitating agents to access and transfer U.S. dollars clandestinely through the U.S. for the benefit of Hezbollah (¶211), the IRGC (¶171), the National Iranian Oil Company ("NIOC") (at the time an agent of the IRGC) (¶¶127, 202), and the Islamic Republic of Iran Shipping Lines ("IRISL")[7] – an Iranian entity that transported components of the EFPs and provided other logistical support for the attacks (¶¶156-162).

The Complaint sets forth specific facts alleging that Deutsche Bank, knowing that Iran was a U.S.-designated State Sponsor of Terrorism, affirmatively participated in the *criminal*

---

[5]    U.S. "dollar clearing" is an elaborate inter-bank system in the U.S. by which banks settle the credits and debits on their accounts with other banks all across the globe on a daily basis. ¶105. The U.S. "dollar clearing" system is not only critical to the workings of the global economy, but it also provides financial institutions (and states) with critical, essential access to global trade and credit in U.S. dollars. ¶106.

[6]    The Society for Worldwide Interbank Financial Telecommunication ("SWIFT") provides a network to allow financial institutions to transfer financial transactions through a formatted financial messaging system.

[7]    Defendant notes that the Complaint alleges that it illegally laundered funds for IRISL *after* it was designated in 2008 by the U.S. government (and hence after the date of *one* of the two attacks relevant to the Complaint). Def. Mem. at 12 n.5. While the post-September 2008 transactions would only have proximately caused one of the Plaintiffs' injuries, they are highly probative of Defendant's state of mind with respect even to earlier transactions. Furthermore, contrary to Defendant's assertion, the U.S. Treasury Department press release concerning IRISL's designation (cited in the Complaint) did not cite just nuclear proliferation concerns as the basis for sanctioning IRISL." It specifically states that "IRISL also facilitates shipments of military-related cargo destined for MODAFL [Iran's military procurement arm] and its subordinate entities …" This cargo included component parts for the EFPs that were used in terror attacks, including those on the Plaintiffs. ¶¶103, 155-162.

Conspiracy with Iran and its agents to alter, falsify, or omit information from payment messages they directed through accounts in the United States on behalf of Iran and Iranian-controlled banks such as Bank Melli and Bank Saderat, for the benefit of such Iranian instrumentalities as NIOC and IRISL that served as financial conduits to Hezbollah and the IRGC. ¶¶141-144, 201-204.

The Conspiracy's aims and objectives included:

1.   Concealing Iran's financial activities and transactions from detection, scrutiny, or monitoring by U.S. regulators, law enforcement, and/or depository institutions;

2.   Facilitating illicit transactions totaling at least $50 million U.S. dollars for Hezbollah's benefit;

3.   Facilitating illicit transactions totaling at least $100 million U.S. dollars for the IRGC's benefit;

4.   Facilitating at least hundreds of illicit transactions on IRISL's behalf totaling more than $60 million U.S. dollars, including over 150 "stripped" transactions *after* IRISL was designated an SDN; and

5.   Enabling Iran and its agents to perpetrate the acts of international terrorism that injured the Plaintiffs in this case. ¶141.

Defendant, in concert with Iran and Iranian banks, primarily used two techniques to effectuate the Conspiracy: (1) removing or altering the names and other information identifying Iranian involvement in the transaction (the practice commonly known and referred to as "stripping" transactions); and (2) converting ordinary transactions involving SWIFT "MT103" payment messages (that would disclose the details of the counter-parties to the transactions)[8] into bank-to-bank transfers known as SWIFT "MT202" payment messages in order to conceal the origin and destination of Iranian funds transfers. ¶¶143, 177, 201. As Defendant's employees

---

[8]   When a bank customer sends an international wire payment, the de facto standard to execute such a payment is the MT103 SWIFT message. When a financial institution sends a bank-to-bank credit transfer, the de facto standard is the MT202 SWIFT message. The crucial difference, during the relevant time period, was that MT202 payments typically did *not* require the bank to identify the originating party to the transactions, and banks typically did not include that information in MT202 messages.

acknowledged, they needed to employ "the tricks and cunning of MT103 and MT202" because of the U.S. sanctions restrictions otherwise applicable to sanctions-related payments. ¶180.

In September 2006, the Office of Foreign Assets Control ("OFAC"), one of the regulatory agencies responsible for monitoring the "dollar clearing" system, excluded Bank Saderat from using the U-Turn Exemption based in large part upon its determination that Bank Saderat was engaged in the "deceptive practices" that formed the basis of the Conspiracy, and that Bank Saderat had used the Conspiracy to fund Hezbollah. ¶¶132, 209-210. Subsequently, in October 2007, the United States designated Bank Saderat a Specially Designated Global Terrorist ("SDGT"). ¶215. That same month, the U.S. designated Bank Melli an SDN, and OFAC excluded it from accessing the "U-Turn" Exemption, because it too had engaged in the same "deceptive practices" that formed the basis of the Conspiracy and had served as a secret conduit between Iran and the IRGC. ¶223.

Defendant has entered into a Consent Order with the New York State Department of Financial Services ("DFS") wherein Deutsche Bank *admits*, *inter alia*, that:

- Bank relationship managers and other employees worked with sanctioned Iranian customers to conceal the details about their payments from U.S. correspondents;

- The Bank disseminated formal and informal written instructions emphasizing the need for utmost care to ensure that no sanctions-related information was included in U.S.-bound payment messages and setting out the various methods to use when processing sanctions-related payments;

- Bank payments-processing employees prepared a training manual for newly-hired payments staff in an overseas office. The manual included a section titled "US Embargo Payments" that explained how to handle payments with a sanctions connection; and

- The Bank marketed its criminal conduct as an "OFAC-safe" handling process and touted its experience in handling sanctions-related payments, regularly educating colleagues in other branches or in other divisions outside the U.S. about handling U.S. dollar payments. ¶¶190-191, 201.

**ARGUMENT**

I.    *BOIM III* RECOGNIZES CIVIL LIABILITY FOR CONSPIRING TO VIOLATE THE MATERIAL SUPPORT STATUTES – 18 U.S.C. § 2339A AND 18 U.S.C. § 2339B.

**A.  Deutsche Bank Fundamentally Misconstrues *Boim III*.**

Deutsche Bank argues that "there is no basis for Plaintiffs' conspiracy-based theory of civil liability under the ATA," quoting Judge Posner's statement in *Boim III* that "statutory silence on the subject of secondary liability means there is none." Def. Mem. at 15, citing 549 F.3d at 689-90. From these words, it concludes that "the Seventh Circuit in *Boim* expressly refused '[t]o read secondary liability into section 2333(a).'" *Id.* at 15.

This summary truncates *Boim III's* actual holding and reasoning. While *Boim III* rejected *common law* secondary liability under the ATA in the part of the decision Defendant cited, it also expressly held one page later that "[p]rimary liability in the form of material support to terrorism has the character of secondary liability . . . [t]hrough a chain of incorporations by reference." *Id.* at 690-691.[9] In other words, accessorial conduct may give rise to civil liability under the ATA, but it must be rooted in violations of the criminal provisions of the material support statutes (§§ 2339A and 2339B), not just in the common law. Here, both statutes *expressly* criminalize conspiracy by using the very words, "conspires to."[10]

Moreover, *Boim III's* reasoning, which Defendant altogether ignores, leaves no doubt of its meaning:

---

[9]    "By this chain of incorporations by reference (section 2333(a) to section 2331(1) to section 2339A to section 2332), we see that a donation to a terrorist group that targets Americans outside the United States may violate section 2333." *Id.* at 690.

[10]    18 U.S.C. § 2339A(a) ("Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [various federal crimes] or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, ***or attempts or conspires to do such an act*** …,"); 18 U.S.C. § 2339B(a)(1) ("Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts ***or conspires to do so*** ….") (emphases added).

9

> The parties have discussed both issues mainly under the rubrics of **"conspiracy"**
> **and** "aiding and abetting." Although those labels are significant primarily in
> criminal cases, they can be used to establish tort liability, *see, e.g.*, *Halberstam v.*
> *Welch*, 705 F.2d 472 (D.C.Cir.1983); *Restatement (Second) of Tort*s §§ 876(a),
> (b) (1979), and there is no impropriety in discussing them in reference to the
> liability of donors to terrorism under section 2333 just because that liability is
> primary. Primary liability in the form of material support to terrorism has the
> character of secondary liability. Through a chain of incorporations by reference,
> Congress has expressly imposed liability on a class of aiders and abettors. [*Id.* at
> 691-692 (emphasis added).]

This reasoning underscores that Congress intended to impose liability on a class of conspirators as well, since "there is no impropriety in discussing" conspiracy in reference to the Bank's liability under section 2333(a). Indeed, *Boim III* itself approvingly cites *Restatement (Second) of Torts* § 876(a), which imposes liability on conspirators who "act in concert with the other or pursuant to a common design."[11]

Thus, in this Circuit, although *common law* conspiracy is foreclosed under the ATA, allegations that rest on violations of the material support statutes *may* be brought under the ATA – including conspiracy to violate §§ 2339A and 2339B – which are forms of "primary liability" that have "the character of secondary liability."

### B. Plaintiffs Sufficiently Allege the Existence of a Conspiracy to Materially Support and to Conceal Material Support for Terrorism.

The elements of criminal conspiracy are: "(1) an agreement to commit an unlawful act; and (2) the defendant must have knowingly and intentionally joined that agreement." *United States v. Cruse*, 805 F.3d 795, 811 (7th Cir. 2015), *cert. denied sub nom. McClain v. United States*, 136 S. Ct. 1699 (2016). Deutsche Bank cannot tenably dispute that the Complaint alleges

---

[11] The only other authority Defendant cites appears to make the same error as the Bank by asserting that § 2333(a) is "silent," when, in fact, it expressly "speaks" with §§ 2339A and 2339B's "conspires" language by a chain of statutory incorporations by reference. *Linde v. Arab Bank, PLC*, 944 F. Supp. 2d 215, 216 (E.D.N.Y. 2013). The precise holding of *Linde* is unclear because the court only dismissed a common law conspiracy claim. *See, Linde*, No. 04 Civ. 2799 (E.D.N.Y. Aug. 10, 2004), ECF No. 4, Amended Complaint ¶¶384-90. Plaintiffs' counsel in this case were also counsel in *Linde*.

an agreement to commit an unlawful act. The Complaint is replete with specific, non-conclusory allegations based on admissions Deutsche Bank made to the U.S. government that evidence an agreement to deliberately and systematically process U.S. dollar-denominated transactions through the United States in a manner intended to evade counter-terrorist and counter-proliferation sanctions. ¶¶176-204.

To establish the agreement element of a conspiracy, plaintiffs need only allege a "tacit understanding. . . through a long course of conduct between the parties." *United States v. Reynolds*, 801 F.2d 952, 954 (7th Cir. 1986). Here there is far more. Deutsche Bank's *admitted* conduct – at least seven years of systematically removing information indicating a connection to Iranian-sanctioned entities in order to conceal its transfers from U.S. regulators, *working directly with sanctioned Iranian customers* (illegitimate agencies, in *Rothstein*'s terms) to conceal the details about their payments, and disseminating formal and informal written instructions to its employees setting out various methods to use to conceal sanctions-related payments – all manifest an agreement between Deutsche Bank, Iran and Iran's agents, both directly and by inescapable inference. *See United States v. Lechuga,* 994 F.2d 346, 349 (7th Cir. 1993) ("Prolonged cooperation is neither the meaning of conspiracy nor an essential element, but it is one type of evidence of an agreement that goes beyond what is implicit in any consensual undertaking….").

### C. Plaintiffs Sufficiently Alleged Defendant's State of Mind in Joining the Conspiracy to Materially Support and Conceal Material Support for Terrorism.

Realizing that it cannot challenge the existence of an agreement, Defendant therefore argues that although its conspiracy to conceal transactions for the illegitimate operations of a State Sponsor of Terrorism may have "*violated some other law,*" it did not *intend* to "facilitate

11

the provision of material support to terrorists killing U.S. soldiers in Iraq." Def. Mem. at 17 (emphasis added).[12] Defendant thereby misstates both the knowledge required for a conspiracy claim and the nature of its conspiracy.

Knowledge of a conspiracy has two elements: "1) knowing participation or membership in the scheme charged and 2) some knowledge of the unlawful aims and objectives of the scheme." *United States v. Lanza*, 790 F.2d 1015, 1022 (2d Cir. 1986). Here, the first element is satisfied by Plaintiffs' allegations that Defendant worked with Iranian banks and others to deliberately and systematically conceal Iranian transactions from U.S. regulators and law enforcement despite the availability of a legal channel for funding Iran's legitimate operations.

The second element of "some knowledge" can be satisfied by allegations that Defendant actually knew, or consciously avoided knowing, the unlawful aims and objectives of the scheme. *Id.*; *United States v. Consol. Packaging Corp.*, 575 F.2d 117, 127 (7th Cir. 1978) ("conspirators … had some knowledge that activities of the same type as practiced by them for the same mutual purposes must have been widespread in the industry"); *United States v. McBride*, 724 F.3d 754, 757 (7th Cir. 2013) (the law equates "willful blindness to knowledge"); *United States v. Salinas*, 763 F.3d 869, 880–81 (7th Cir. 2014) (upholding conspiracy conviction of defendant who transported cash in a manner to avoid police detection, as he consciously avoided knowing the cash benefitted a drug dealing conspiracy). *See also United States v. Ferraina,* 19 F.3d 145, 154-55 (2d Cir. 2002) (co-conspirator can be found liable for avoiding knowledge of some of the conspiracy's unlawful goals).

---

[12]     The Bank reinforces its intent-to-commit terrorism argument via a misleading and undisclosed ellipsis of the ATA. Twice it asserts that § 2331(1)(A) "limits the scope of terrorism to particular acts – 'violent acts' and 'acts dangerous to human life' that violate criminal laws," citing § 2331(1)(A). Def. Mem. at 3, 16. In each case, it omits the definition's predicate: "'international terrorism' means activities that (A) ***involve*** violent acts or acts dangerous to human life …." (emphasis added). Concealing bank transfers for illegitimate Iranian operations from U.S. regulators and thus supporting those violent and dangerous operations may not by itself be violent, but it surely "involves" violent and dangerous acts by those operations.

Defendant's argument that by its participation in a mere money laundering conspiracy, it knew only that it "violated other laws," is a common (though rarely accepted) excuse offered by co-conspirators: "Often the defendant will say that he agreed with someone else to do something but did not know the scope of the agreement," *United States v. Kehm*, 799 F.2d 354, 362 (7th Cir. 1986). For example, in *Kehm,* the defendant, a lawyer, set up a corporation through which he rented an airplane that his co-conspirators used to smuggle drugs. He claimed no knowledge of the smuggling but conceded that he had set up the corporation. The Seventh Circuit upheld his conviction because "awareness of a high probability of something, coupled with avoidance of further knowledge for fear of what you will learn" is sufficient. *Id.*

The Complaint alleges, and common sense affirms, that when Deutsche Bank entered into the criminal Conspiracy to provide and conceal the transfer of millions of dollars for a State Sponsor of Terrorism – deliberately failing to use the channel for funding legitimate Iranian operations afforded by the U-Turn regulations – it fully understood that its co-conspirator(s) would use *some* of that money to support the illegitimate program of terrorism. As Judge Posner noted in *Boim III*:

> Giving money to Hamas, like giving a loaded gun to a child (which also is not a violent act), is an "act dangerous to human life." And it violates a federal criminal statute enacted in 1994 and thus before the murder of David Boim—18 U.S.C. § 2339A(a), which provides that "whoever provides material support or resources ..., knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [18 U.S.C. § 2332]," shall be guilty of a federal crime. So we go to 18 U.S.C. § 2332 and discover that it criminalizes the killing (whether classified as homicide, voluntary manslaughter, or involuntary manslaughter), conspiring to kill, or inflicting bodily injury on, any American citizen outside the United States. *Boim III* at 690.

Providing "OFAC-safe" money laundering services to a State Sponsor of Terrorism is like giving a loaded gun to a child – an act objectively dangerous to human life regardless of whether Deutsche Bank desired the result or was indifferent to it. The Complaint plausibly

13

alleges that Deutsche Bank knew there was a high probability that Iran would use at least some of the money it secretly funneled through the United States as a result of the Conspiracy for Iran's support of terrorism, and it is objectively clear that such clandestine transfers (as opposed to transparent transfers for legitimate operations once permitted by U.S. law) are dangerous to human life. In this context, the Defendant cannot convert a dubious fact-bound ostrich defense at trial into grounds to dismiss the Complaint as a matter of law on a Rule 12 motion.

Furthermore, plaintiffs need only allege that a defendant agreed to "pursue the same common objective" of the conspiracy, even if it did not "agree to commit or facilitate each and every part of the substantive offense." *Ocasio v. United States*, 136 S. Ct. 1423, 1429-30 (2016).[13] "The law does not demand proof that each conspirator knew the exact limits of the illegal plan or the identity of all participants therein." *Hoffman-LaRoche, Inc. v. Greenberg*, 447 F.2d 872, 875 (7th Cir. 1971). It requires only that the essential nature and general scope of a plan is known to each person who is to be held responsible for its consequences. *Id.*[14] "The fact that a conspiracy's various members may play different roles in executing it *and may have dissimilar motives for participating in it*, does not mean that a single conspiracy does not exist." *United States v. Cervantes*, 466 F.2d 736, 738 (7th Cir. 1972) (emphasis added); *see also*

---

[13]     In fact, a defendant may be shown to have joined a conspiracy, "'even though [it] was *incapable* of committing the substantive offense' [itself]." *Id.* (quoting *Salinas v. United States*, 522 U.S. 52, 64 (1997)) (emphasis added).

[14]     In *United States v. Morse*, 851 F.2d 1317 (11th Cir. 1988), defendant was convicted of conspiracy to possess with intent to distribute marijuana and conspiracy to import marijuana. His involvement in the conspiracy consisted of selling a small, private plane to his one of his co-conspirators. The circumstantial evidence identified by the Eleventh Circuit included the fact that the plane "was particularly suited for smuggling;" it was sold for almost twice its market value; all payments were made in cash; the buyer was 23 years old; and the defendant never provided the FAA with an aircraft registration application or bill of sale as required by law. *See also United States v. Frink*, 912 F.2d 1413, 1417 (11th Cir. 1990) (upholding conspiracy conviction of Ohio car dealer who sold eleven vehicles to narcotics traffickers) ("Frink knowingly violated vehicle registration laws by listing false names and addresses on the registration forms. Deliberately falsified paperwork is even more indicative of guilty knowledge than the omission of paperwork in *Morse*, which we held supported an inference of intent. Although a single transaction of this type might not support a conviction of conspiracy, the sale of eleven vehicles with cash, all in-house deals, and the use of falsified documents on vehicles Frink never saw provides substantial circumstantial evidence to support the inference of Frink's willing participation in the conspiracy.").

*Hampton v. Hanrahan*, 600 F.2d 600, 620–21 (7th Cir. 1979) ("The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective *or possess the same motives for desiring the intended conspiratorial result*.") (quoting *Hoffman-LaRoche, Inc.*, 447 F.2d at 875), *rev'd on other grounds*, 446 U.S. 754 (1980) (emphasis added). Therefore, even if Defendant just did it for the money, as it asserts, Def. Mem. at 19, it cannot avoid liability for knowing participation in a conspiracy that sent more than a hundred million dollars (according to U.S. government findings) to Iran's terror proxies, which committed the terrorist acts that injured Plaintiffs. ¶¶141, 171, 211.

Finally, Defendant's effort to segment its knowing (and admitted) participation in a money-laundering and sanctions-evading conspiracy that "violat[ed] some other laws" from a conspiracy to provide material support used to prepare for and conduct terrorism, ignores the actual offense described by the material support statute. That offense is not just providing material support knowing (*or* intending) that it will be used in preparation for or carrying out terrorism. It is also "conceal[ing] or disguis[ing] the nature, location, source, or ownership of material support" – precisely the goal, the nature, and the result of Defendant's activities. 18 U.S.C. § 2339A(a). The Complaint sufficiently alleges not just that the Defendant knew or consciously avoided knowing that it was providing funds for illegitimate Iranian programs, including terrorism, but also that it knew it was assisting those programs by "concealing or disguising" the transactions. *See McBride*, 724 F.3d at 757 ("[w]hat made Boyett a co-conspirator of the defendant [for money laundering] was not that she knew he was a money launderer, … but that knowing it she assisted him in his money laundering by depositing drug money"). Like Boyett in *McBride*, what made the Bank a co-conspirator was not just that it knew

it was laundering money for Iran, but that it knew it was assisting a State Sponsor of Terrorism conceal billions of dollars from U.S. law enforcement for what could only have been illegitimate purposes, including terrorism.

## II. PLAINTIFFS HAVE SUFFICIENTLY PLED THAT ACTS FORESEEABLY MADE IN FURTHERANCE OF THE CONSPIRACY PROXIMATELY CAUSED THEIR INJURIES.

Although Defendant grudgingly acknowledges the well-settled principle that "a conspirator may be liable for foreseeable crimes committed in furtherance of a conspiracy," Def. Mem. at 17 (quoting *United States v. Sklena*, 692 F.3d 725, 729 (7th Cir. 2012)), it argues causation as if Plaintiffs had *not* alleged conspiracy, relying entirely on non-conspiracy case law. By contrast, under the *Pinkerton*[15] principle acknowledged in *Sklena*, a member of a conspiracy is liable for *all* foreseeable acts made in furtherance of the conspiracy and their proximate consequences, even if the member's own actions did not proximately cause a plaintiff's injuries. Under *Pinkerton* "a defendant may be found guilty of a substantive offense committed by a co-conspirator if the offense was committed in furtherance of the conspiracy at the time the defendant was a member of the conspiracy" and "even if the defendant neither participated in nor had knowledge of the substantive offense." *United States v. Pisman*, 443 F.3d 912, 913 (7th Cir. 2006). Indeed, a defendant is liable for *all* foreseeable acts made in furtherance of the conspiracy even if it had no knowledge of those acts. *United States v. Diaz*, 864 F.2d 544, 548-49 (7th Cir. 1988) (citing *Pinkerton v. United States*, 328 U.S. at 648).[16]

---

[15]     *Pinkerton v. United States*, 328 U.S. 640 (1946).

[16]     *See also, DT Boring, Inc. v. Chicago Pub. Bldg. Comm'n*, 2016 WL 3580756, at *13 (N.D. Ill. 2016) ("As with all conspiracy claims, the predicate acts allegedly committed by [a co-conspirator] may serve as the proximate cause of plaintiff's injuries for purposes of plaintiff's § 1962(d) conspiracy claim [against all co-conspirators].") (applying conspiracy law to civil claim by plaintiff injured "by reason of" unlawful activity); *M.C. Van Kampen Trucking, Inc. v. Reliable Truck Parts, Inc.*, 1994 WL 35909, at *4 (N.D. Ill. 1994) ("This does not mean, however, that a RICO plaintiff who can show injury from a conspiracy's racketeering activity must demonstrate that his injury was 'caused' by every individual member of the conspiracy, or that the injury would not have occurred 'but for' a

When Deutsche Bank knowingly conspired with Iran, it knew that: Iran was a State Sponsor of Terrorism; Iran could only legally process transactions within a safe harbor created for transparent, fully-disclosed transactions; Iran has repeatedly targeted Americans through acts of terrorism; and that facilitating billions of dollars in clandestine funds transfers to Iran, by augmenting Iran's resources for nefarious activities, including terrorism, enables Iran and its agents to kill or wound, or try to kill, or conspire to kill more Americans. The tragic though inevitable consequences of Defendant's criminal conduct were especially foreseeable given that Defendant performed transactions *directly* for several specially-designated Iranian entities, including SDGT Bank Saderat, SDN Bank Melli, SDN National Iranian Oil Company (then an agent of the IRGC) and the Islamic Republic of Iran Shipping Lines. *See Boim III*, 549 F.3d at 701–02 ("Nor should donors to terrorism be able to escape liability because terrorists and their supporters launder donations through a chain of intermediate organizations.").

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) and *In re Terrorist Attacks on Sept. 11, 2001 ("Al Rajhi Bank")*, 714 F.3d 118 (2d Cir. 2013), on which Defendant relies (Def. Mem. at 8-14), are not to the contrary. First, neither involved claims based on conspiracy.[17] Second, the *Rothstein* plaintiffs – who sought to hold UBS responsible for allegedly providing a hundred million dollars to Iran in cash – argued for a "showing of *less* than proximate cause" on the novel theory that "causation may be presumed" from a "per se violation" of a statute. 708 F.3d at 94-95. The Second Circuit rejected this theory in favor of ordinary proximate cause, which is the standard in this case. It then held that entirely conclusory allegations that cash dollars had been

---

particular conspirator's membership in the conspiracy."). *See also, Geinosky v. City of Chicago*, 675 F.3d 743, 750 (7th Cir. 2012) (holding in a 42 U.S.C. § 1983 action that conspirators who did not harm plaintiff during the limitations period "can still be held liable for the later actions of co-conspirators that [proximately] harmed the plaintiff during the limitations period").

[17]     In their supplemental Rule 12(e) submission the *Al Rajhi* plaintiffs proffered certain conclusory allegations of conspiracy and defendants moved to dismiss those claims based on *Twombly* and *Iqbal,* but the Second Circuit did not even comment on those allegations in its decision.

provided to Iran which the defendant knew would be used to cause and facilitate terrorist attacks did not meet *Twombly's* pleading standard because: (1) Iran has "many legitimate agencies, operations, and programs to fund," and (2) it found "no non-conclusory allegation in the complaint that shows that the moneys UBS transferred to Iran were in fact sent to Hizbollah or Hamas or that Iran would have been unable to fund the attacks by Hizbollah and Hamas without the cash provided by UBS." *Id.* at 97. Moreover, unlike *Rothstein*, the Complaint specifically alleges, based on U.S. government findings and reports, that Defendant's customers and co-conspirators sent $50 million to Hezbollah (¶¶141, 171, 212,) and $100 million to the IRGC (¶¶141, 212, 223).[18]

In *Al Rajhi Bank*, plaintiffs did not allege that defendant's specific accounts were ever used to send money to Al Qaeda. 714 F.3d 118. Absent additional allegations, the Second Circuit held that the entirely "conclusory" allegations of "routine banking services to organizations and individuals said to be affiliated with al Qaeda" were insufficient to allege proximate causation.

---

[18]     In passing, Defendant suggests in a footnote that in three recent decisions the Supreme Court has implicitly added a "but-for" causation requirement to the ATA, after *Boim III* expressly held otherwise. Def. Mem. at 13 n.6 (citing *Burrage v. United States*, 134 S. Ct. 881, 889 (2014); *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013); *Paroline v. United States*, 134 S. Ct. 1710 (2014)). The very same counsel unsuccessfully made the identical argument in *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig. ("Chiquita")*, 2015 WL 71562, at *7 (S.D. Fla. 2015) ("Neither *Nassar* nor *Burrage* mandate reconsideration of [prior ruling rejecting "but-for" causation]."). The court there rejected that argument for the same reason that it was also rejected in *Linde v. Arab Bank PLC*, 97 F. Supp. 3d 287, 326-28 (E.D.N.Y. 2015):

> The Supreme Court's cases have nothing to do with the ATA, and are distinguishable on their facts. The fact remains that no court has expressly held that the ATA's civil remedy requires a showing of but-for causation. And in the only Court of Appeals decision to actually decide the issue [*Boim III*], Judge Posner set forth a detailed and compelling explanation of why it does not.

The *Linde* court's finding remains true today: no court has yet accepted the but-for causation argument Defendant half-heartedly makes. Indeed, the Supreme Court in *Barrage* and *Paroline* noted that a "but-for" requirement should *not* be read into statutes where doing so would render the statutes meaningless. *See Paroline*, 134 S. Ct. at 1727 ("It would be unacceptable to adopt a causal standard so strict that it would undermine congressional intent where neither the plain text of the statute nor legal tradition demands such an approach."); *Burrage*, 134 S. Ct. at 888 (noting that courts may find a "but-for" requirement "[w]here there is no textual or contextual indication to the contrary"). As shown in *Linde* and *Chiquita*, the ATA would be "eviscerated" if a "but-for" requirement was required, *Linde*, 97 F. Supp. 3d at 326, as "it is absolutely unclear what fact pattern would ever satisfy the ['but-for'] requirements," *Chiquita*, 2015 WL 71562, at *7.

714 F.3d at 124. But here, Defendant admits to engaging in the antithesis of "routine banking services" by systematically concealing from U.S. regulators and law enforcement over 27,000 transactions and *at least* 600 transactions that it directly moved through the U.S. financial system on behalf of specially designated entities. The plausible inference (and Plaintiffs would argue, the *only* plausible inference) is that it knew these transactions were for the illegitimate operations of a State Sponsor of Terrorism, including terrorism, and foreseeably could have resulted in the furtherance of those terrorist operations, resulting in grievous injuries to Plaintiffs and others.

III. **CRIMINAL VIOLATIONS OF THE MATERIAL SUPPORT STATUTES ARE ACTS THAT INHERENTLY "APPEAR TO BE INTENDED ... TO INTIMIDATE OR COERCE A CIVILIAN POPULATION" AND ARE ACTS OF INTERNATIONAL TERRORISM.**

Defendant argues that its alleged violations of § 2339A and § 2339B do not satisfy 18 U.S.C. § 2331's definitional requirement that those acts "appear to be intended … to intimidate or coerce a civilian population." Tellingly, it supports this argument by citing *Mastafa v. Chevron Corp.*, 770 F.3d 170, 194 (2d Cir. 2014), a case brought under the Alien Tort Statute, *not* the ATA, yet ignoring this Circuit's specific analysis of the requirement in *Boim III* as well as numerous decisions that have rejected its argument. *Boim III* treated it head-on:

> A knowing donor to Hamas—that is, a donor who knew the aims and activities of the organization—would know that Hamas was gunning for Israelis (unlike some other terrorist groups, Hamas's terrorism is limited to the territory of Palestine, including Israel [internal citation omitted], that Americans are frequent visitors to and sojourners in Israel, that many U.S. citizens live in Israel (American Citizens Abroad, an advocacy group for expatriates, reports on the basis of State Department data that in 1999 there were about 184,000 American citizens living in Israel, accounting for about 3.1 percent of the country's population, [internal citation omitted], and that donations to Hamas, by augmenting Hamas's resources, would enable Hamas to kill or wound, or try to kill, or conspire to kill more people in Israel. And given such foreseeable consequences, such donations would "appear to be intended ... to intimidate or coerce a civilian population" or to "affect the conduct of a government by ... assassination," as required by section 2331(1) in order to distinguish terrorist acts from other violent crimes, though it is not a state-of-mind requirement; it is a matter of external appearance rather than

19

subjective intent, which is internal to the intender. *Boim III*, 549 F.3d at 693-94.

So too, a bank that knowingly conspired with State Sponsor of Terrorism Iran and that knew that Iran needed to obtain dollar-cleared funds for illegitimate operations (operations it could not legally fund via the U-Turn Exemption) and that systematically concealed transfers of such funds to Iranian banks and other counterparties for such operations from U.S. regulatory authorities and law enforcement, in express violation of the material support statutes, as well as the Iranian sanctions regime, would know that Iran was gunning for Americans, that Americans were serving in Iraq between 2003 and 2011, that many U.S. servicemen were being killed and wounded in Iraq, and that facilitating millions of dollars in clandestine funds transfers to Iran, by augmenting Iran's resources, would enable Iran to kill or wound, or try to kill, or conspire to kill more Americans in Iraq. Given such foreseeable consequences, such funds transfers would inherently "appear to be intended ... to intimidate or coerce a civilian population" or to "affect the conduct of a government by ... assassination," as required by section 2331(1) – as a matter of external appearance rather than subjective intent. *See also Linde v. Arab Bank, Plc*, 97 F. Supp. 3d at 322 ("I agree with those courts that have held that a violation of 18 U.S.C. § 2339B is itself an act of international terrorism"); *Goldberg v. UBS AG*, 690 F. Supp. 2d 92, 112-15 (E.D.N.Y. 2010) (collecting cases); *Strauss v. Credit Lyonnais, S.A.*, 2006 WL 2862704, at *1 (E.D.N.Y. 2006) ("Violations of 18 U.S.C. § 2339B and § 2339C are recognized as international terrorism under 18 U.S.C. § 2333(a)."). *Accord Abecassis v. Wyatt* , 7 F. Supp. 3d 668, 672-673 (S.D. Tex. 2014); *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 42-43 (D.D.C. 2010).[19]

---

[19]    Ignoring these cases, Defendant instead cites two outlier cases. In *Stutts v. De Dietrich Grp.*, 2006 WL 1867060, at *2 (E.D.N.Y. 2006), U.S. servicemen who were exposed to chemicals during U.S. Defense Department environmental clean-up activities conducted after the first Gulf War sued banks against whom, the court found, the "sole allegation of conduct by the Bank Defendants is that they issued letters of credit in favor of the Supplier Defendants." *Id*. The court held, without elaboration, that the defendants' actions of "engaging in commercial banking activity … were [not] designed to coerce civilians or government entities as required under §2331." *Id*. Here, of course, the Defendants' activities resulting in the DFS Consent Order were anything but routine

**CONCLUSION**

David Schaefer lost his life serving his country in Iraq. Charles James Shaffer was severely injured in the service of his country. Like Iran's other co-conspirators, Deutsche Bank knows it is "too big to jail," that its criminal conduct will not result in any of "Deutsche Bank's employees [who] 'saw as 'lucrative' U.S. dollar business for sanctioned customers'" being prosecuted and that at most, it will face additional fines and be forced to improve its compliance functions. In sum, it fully expects to get away with murder. The ATA was enacted by Congress for the express purpose of empowering Americans like Charles Shaffer and the family of David Schaefer to hold what Judge Posner described as terrorism's "financial angels" accountable. The Complaint adequately pleads a sound legal basis for permitting Plaintiffs their day in court.

For all of the foregoing reasons, the Court should deny Defendant's motion to dismiss.

**OSEN LLC**

By    /s/ Gary M. Osen
      Gary M. Osen (NJ Bar No. 030731993)
      Ari Ungar
      Aaron Schlanger
      Naomi B. Weinberg
      Peter Raven-Hansen, Of Counsel
      Michael J. Radine
      William A. Friedman
      2 University Plaza, Suite 201
      Hackensack, NJ 07601
      (201) 265-6400
      (201) 265-0303

---

commercial banking, but instead (according both to the Consent Order and Defendant's own admissions) involved numerous illegal transactions. *Stansell v. BGP, Inc.*, 2011 WL 1296881 (M.D. Fla. 2011), relied on the defendant's motive as alleged in the complaint to find that plaintiffs had not adequately pled the § 2331(1)(B) element (oddly inviting them to replead based on a "good faith belief that there were facts to support the claim"). In so doing, the court "relied on the *subjective* intent of the defendants as pled by the plaintiffs," as the later decision noted in distinguishing *Stansell. Abecassis v. Wyatt*, 7 F. Supp. 3d at 676 (emphasis added). But "[t]he subjective intent of the defendant is not relevant." *Id.*

**DOWD & DOWD, P.C.**
Douglas P. Dowd (#29240MO)
211 North Broadway, Suite 4050
St Louis, MO 63102
(314) 621-2500
(314) 621-2503 Fax

**TURNER & ASSOCIATES, P.A.**
Tab Turner
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
(501) 791-2277

Attorneys for Plaintiffs

**<u>CERTIFICATE OF SERVICE</u>**

     I hereby certify that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF on this 15th day of August, 2016. I also certify that the foregoing document is being served this day on all counsel of record registered to receive electronic Notices of Electronic Filing generated by CM/ECF.

                                     <u>/s/ Gary M. Osen</u>