IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CHARLES SHAFFER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| -v- | ) | Case No. 3:16-cv-497 |
| | ) | |
| DEUTSCHE BANK AG, | ) | |
| | ) | |
| Defendant. | ) | |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT DEUTSCHE BANK AG'S MOTION TO DISMISS**

HEPLERBROOM LLC
130 N. Main St.
P.O. Box 510
Edwardsville, IL 62025
(618) 656-0184

COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., NW
Washington, DC 20001
(202) 662-6000

*Attorneys for Deutsche Bank AG*

## TABLE OF CONTENTS

Page

I. Plaintiffs' Arguments For Evading The ATA's Proximate Cause Requirement Fail. ..... 2

II. Plaintiffs' Defense Of Their "Conspiracy" Theory Fails. ..... 4

III. Plaintiffs Read The Objective Terroristic Intent Requirement Out Of The ATA. ..... 7

## TABLE OF AUTHORITIES

**CASES** Page

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....7

*Boim v. Holy Land Foundation for Relief and Development*,
549 F.3d 685 (7th Cir. 2008) (en banc) ....5, 7, 8

*Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*,
135 F.3d 837 (2d Cir. 1998)....3

*Linde v. Arab Bank, PLC*,
944 F. Supp. 2d 215 (E.D.N.Y. 2013) ....5

*Linde v. Arab Bank, PLC*,
97 F. Supp. 3d 287 (E.D.N.Y. 2015) ....7

*O'Neill v. Al Rajhi Bank*,
714 F.3d 118 (2d Cir. 2013)....4

*Ocasio v. United States*,
136 S. Ct. 1423 (2016)....6

*Rothstein v. UBS AG*,
708 F.3d 82 (2d Cir. 2013)....1, 3, 4

*Stansell v. BGP, Inc.*,
2011 WL 1296881 (M.D. Fla. Mar. 31, 2011) ....8

*United States v. Collins*,
966 F.2d 1214 (7th Cir. 1992) ....6

*United States v. Kehm*,
799 F.2d 354 (7th Cir. 1986) ....6

*United States v. Klein*,
515 F.2d 751 (3d Cir. 1975)....6

*United States v. Ross*,
510 F.3d 702 (7th Cir. 2007) ....6

**STATUTES AND REGULATIONS**

18 U.S.C. § 2331....7, 8

18 U.S.C. § 2333....3

31 C.F.R. § 560.516 (2008) ........................................................................................................1

Plaintiffs' opposition seeks to evade proximate causation through pleading artifice, disregards black-letter conspiracy law, and reads objective terroristic intent out of the ATA. As explained below, it is no answer to the legal arguments in Deutsche Bank's motion to dismiss.[1]

Plaintiffs seek to divert attention from the legal flaws in their expansive theory by emphasizing that Deutsche Bank "admit[ted]" to processing transactions involving sanctioned countries in a non-transparent manner. Opp. 8. But according to the figures Plaintiffs recite, 99.7% (by value) of the dollar-clearing transactions at issue did not involve sanctions violations. Opp. 3.[2] Of the 0.3% that did (some involving countries other than Iran), there is no allegation that a single dollar ended up in the hands of the terrorists responsible for Plaintiffs' injuries.

Even if *every* alleged transaction had violated sanctions laws, ATA liability still would not follow; in *Rothstein*, the Second Circuit rejected ATA liability notwithstanding that UBS had "illegally provid[ed] Iran with hundreds of millions of dollars" in violation of sanctions laws. *Rothstein v. UBS AG*, 708 F.3d 82, 87 (2d Cir. 2013). Yet Plaintiffs' theory is even weaker. Whether Deutsche Bank's actions are best viewed as a failure of "compliance policies and procedures," as the New York Department of Financial Services saw it (Compl. Ex. A at 2), or something else, they certainly do not resemble an attempt to "get away with murder," as Plaintiffs argue. Opp. 21. Deutsche Bank does not "trivialize" the conduct that led to civil

---

[1] For the reasons explained in the motion for additional pages (ECF No. 47), which this Court granted (ECF No. 48), a reply is warranted under the exceptional circumstances of this case. *See* Local Rule 7.1(c).

[2] By number of transactions, 98% did not involve sanctions violations. Opp. 3. Plaintiffs cannot dispute that the U-Turn Exemption authorized nearly all of the transactions at issue. Plaintiffs instead imply that it was bad policy and stress that it was revoked (Opp. 2 n.2), but they ignore the fact that the revocation occurred *after* Deutsche Bank remedied its compliance issues. Compl. Ex. A ¶ 9. Plaintiffs also suggest that transparency was an express condition of the U-Turn regulation (Opp. 6), but they cite nothing more than their Complaint's own characterization; the regulation itself nowhere dictated the contents of SWIFT messages. *See* 31 C.F.R. § 560.516 (2008). That is one reason regulators have treated Deutsche Bank's practices as reflecting "[in]adequate risk management and compliance policies and procedures" – not a sanctions-evading conspiracy to fund terrorists. *Deutsche Bank AG*, Order, No. 15-034-B-FB, at 2 (Bd. Gov. Fed. Res. Sys. Nov. 4, 2015), *available at* http://tinyurl.com/FedDBAG.

settlements with bank regulators; it has cooperated with regulators, "improve[d] its compliance functions," and paid "fines." Opp. 21. But it does not follow from any of Deutsche Bank's since-remedied compliance problems that it entered a terror-funding "conspiracy," or that the transactions it processed for the benefit of certain Iranian banks caused battlefield casualties in Iraq. The Court should reject Plaintiffs' unsupported attempt to create a new species of ATA litigation under which compliance failures lead to treble damages claims by soldiers for war injuries.

**I. Plaintiffs' Arguments For Evading The ATA's Proximate Cause Requirement Fail.**

Plaintiffs cannot answer a fundamental question: how were their injuries caused by Deutsche Bank's alleged non-transparent banking transactions? The best they can do is to assert that Deutsche Bank's "*customers and co-conspirators*" – not Deutsche Bank itself – "sent $50 million to Hezbollah and $100 million to the IRGC." Opp. 18 (emphasis added). But they do not allege that Deutsche Bank played any role in these transfers. Even within the tiny fraction of transactions Deutsche Bank processed that involved sanctions violations, there is no allegation that a single dollar processed by Deutsche Bank went to terrorists.[3]

Rather than plead facts supporting a claim that dollar-clearing transactions processed by Deutsche Bank caused their injuries, Plaintiffs attempt to plead around the problem. In their view, because Deutsche Bank joined a nebulous "conspiracy," it is vicariously liable for donations to terrorists made separately by its "customers." That theory is untenable.

Plaintiffs rely on the criminal law rule that a conspirator may be convicted of its co-conspirators' foreseeable crimes. Opp. 16. But aside from the fact that (i) conspiracy is not a

---

[3] Plaintiffs' counsel have played fast and loose with this $150 million, also claiming that several *other* banks (but not Deutsche Bank) are responsible for the same transfers. *See Freeman v. HSBC Holdings Plc*, No. 14-cv-6601, Pls.' Br. in Opp. to Mot. to Dismiss at 35 (E.D.N.Y. July 10, 2015).

recognized basis for imposing civil liability under the ATA, and (ii) Plaintiffs have not adequately pleaded a conspiracy, the alleged conspiracy offense is at most relevant to whether Deutsche Bank committed an "act of international terrorism." *See infra* § II. Plaintiffs must still plead facts showing that they were injured "by reason of" Deutsche Bank's supposed terrorist act. 18 U.S.C. § 2333. "By reason of" means the plaintiffs "must show that [their] injury was proximately caused *by the defendant*," *Rothstein*, 708 F.3d at 89 (emphasis added) – not "customers" or "co-conspirators."

Plaintiffs's argument that *Rothstein* was not "based on conspiracy" (Opp. 17) falls flat. "UBS [allegedly] knew full well that the cash dollars it was providing to a state-sponsor of terrorism such as Iran would be used to cause and facilitate terrorist attacks." 708 F. 3d at 97. Except for the conspiracy jargon added to this Complaint, the substance of Plaintiffs' theory is identical: "Deutsche Bank entered into the criminal Conspiracy to provide and conceal the transfer of millions of dollars for a State Sponsor of Terrorism" and "fully understood that its co-conspirator(s) would use some of that money to support the illegitimate program of terrorism." Opp. 13. It would be a simple task to recast *Rothstein* as a "conspiracy" among UBS, Iran, and its terror proxies; point out that UBS "fully understood" that "some of that money" would go to terrorists; and attempt to hold UBS liable for the acts of a "co-conspirator," Iran, in financing terrorists. The proximate causation requirement cannot be nullified by pleading artifices. *Cf. Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 843 (2d Cir. 1998) (warning against "subverting" the "practical impact" of a decision by "replead[ing] as conspiracy claims"). However framed, an ATA claim based on the provision of financial services to Iran as a sponsor of terrorism cannot succeed without alleging that the funds supplied "were in fact sent" to terrorists. *Rothstein*, 708 F.3d at 97. Plaintiffs make no such allegation here.

Plaintiffs try to characterize *Rothstein* as merely creating a "safe harbor" for transactions shown to benefit Iran's "many legitimate agencies, operations, and programs" (Opp. 2 (quoting *Rothstein*, 708 F.3d at 97)), arguing that this case is different because Deutsche Bank evaded sanctions and expected some of the money to support illegitimate programs. But that is no distinction: the transfers in *Rothstein* were "illegitimate" in the same sense that Plaintiffs allege here (*i.e.*, sanctions violations), and UBS "knew full well" the likelihood that Iran would use the funds for terrorism. *Rothstein*, 708 F.3d at 97.

Plaintiffs fare no better attempting to distinguish *O'Neill v. Al Rajhi Bank*, 714 F.3d 118 (2d Cir. 2013). They say that *Al Rajhi* failed because the plaintiffs "did not allege that defendant's specific accounts were ever used to send money to Al Qaeda." Opp. 18. That is also not a distinction. Here too, Plaintiffs do not allege that Deutsche Bank's dollar-clearing transactions were ever used to send money to Hezbollah or other terrorists.

Tellingly, Plaintiffs' opposition does not dispute the sweeping implications of their theory – ATA liability to U.S. soldiers for providing "material support to Iran." Compl. ¶ 240; *see* Mem. 14. Nothing in the facts of Deutsche Bank's civil banking settlements constrains the scope of this claim, and Plaintiffs offer no reason why anyone doing business with Iran should not fear the same liability. On their theory, even companies operating with the blessing of the U.S. Government should "fully underst[and]" (Opp. 13) that Iran still sponsors terrorists, and would therefore be liable for the terrorist acts that its "customer" (Opp. 18) foreseeably sponsors.

## II. Plaintiffs' Defense Of Their "Conspiracy" Theory Fails.

Plaintiffs claim that ATA liability may be based on a "conspiracy to violate §§ 2339A and 2339B [the criminal material support to terrorists statute]," arguing that this theory is authorized by *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685 (7th Cir. 2008) (en banc). Opp. 9-10. *Boim* recognized "the liability of *donors to terrorism* . . . because

that liability is primary," *i.e.*, "[p]rimary liability in the form of material support to terrorism." *Id.* at 691 (emphasis added). Deutsche Bank, however, is not accused of making "donations to terrorists," or of committing the primary offense of material support. Plaintiffs simply assume that because Congress also criminalized *secondary* violations of the material support statute, those violations can form the predicate of an ATA claim. Opp. 10. That is a bridge too far, vastly expanding the pool of potential ATA defendants beyond what *Boim* construed the ATA to permit. Conspiracy to provide material support is not "primary liability in the form of material support to terrorism," *Boim*, 549 F.3d at 691 – it is liability of a wholly secondary kind.[4]

Plaintiffs observe that §§ 2339A and 2339B "us[e] the very words, 'conspires to.'" Opp. 9. That does not help Plaintiffs' case – it sinks it. Only one court has considered Plaintiffs' novel conspiracy theory, and it rejected it for that reason: Congress's recognition of secondary *criminal* liability in the material support statute makes its "silence regarding civil conspiracy liability in § 2333(a) speak[] louder." *Linde v. Arab Bank, PLC*, 944 F. Supp. 2d 215, 217 (E.D.N.Y. 2013).[5]

But even if a criminal conspiracy to violate the material support statute can constitute an "act of international terrorism," Plaintiffs nowhere explain how Deutsche Bank committed that crime. They assert a vague "agreement to commit an unlawful act" (Opp. 11), but ignore a vital requirement: the conspirator must "reach an agreement with the '*specific intent* that the *underlying crime* be committed.'" *Ocasio v. United States*, 136 S. Ct. 1423, 1429 (2016)

---

[4] Plaintiffs highlight language in *Boim* seeing "no impropriety in discussing" secondary concepts of liability, including conspiracy (Opp. 10), but ignore the import of the rest of the sentence: "*in reference to the liability of donors to terrorism*." *Boim*, 549 F.3d at 691 (emphasis added). That qualification is key, because even though material support is a traditionally secondary form of liability, Congress affirmatively turned "donations to terrorism" into a primary offense.

[5] Plaintiffs claim that *Linde* did not address reliance on criminal conspiracy as a predicate to primary liability. Opp. 10 n.11. Wrong. *Linde* expressly dismissed "all conspiracy claims," and rejected Plaintiffs' reliance on the fact that "§§2339A, 2339B, and 2339C specifically refer to criminal conspiracy." *Linde*, 944 F. Supp. 2d at 917.

(emphasis altered). Plaintiffs' theory is based on a "conspiracy to violate §§ 2339A and 2339B" (Opp. 10), but they never explain how Deutsche Bank agreed to a scheme specifically intending for anyone to commit the material support offense, *i.e.*, to fund terrorists.[6] They just allege that someone else funding terrorists was "foreseeabl[e]" (Compl. ¶ 248), and argue that a conspiracy can be established based on "indifferen[ce]" to this possibility. Opp. 13. The law is squarely to the contrary. "A person who is indifferent to the goals of an ongoing conspiracy *does not become a party to this conspiracy* merely because that person knows that his or her actions *might somehow be furthering that conspiracy*. Rather, a person becomes a member of the conspiracy when that person *intends* to join an agreement to *carry out the criminal purposes* underlying the conspiracy." *United States v. Collins*, 966 F.2d 1214, 1219-20 (7th Cir. 1992) (emphasis added).

Ignoring the rule that "conspiracy is a specific intent crime," *United States v. Ross*, 510 F.3d 702, 713 (7th Cir. 2007), Plaintiffs focus on the distinct element of knowledge. Opp. 12. As one of the cases they cite recognizes, an alleged conspirator must act "knowingly *and* intentionally." *United States v. Kehm*, 799 F.2d 354, 363 (7th Cir. 1986) (emphasis added). It is true that "[k]nowledge of the illicit purpose [of the conspiracy] will also serve as the foundation for the required proof of specific intent." *United States v. Klein*, 515 F.2d 751, 753 (3d Cir. 1975). And willful blindness can count as knowledge, which in turn can be a basis for inferring intent. But it is equally clear that allegations of conscious avoidance are no substitute for proving an intentional agreement to commit the specified crime; "[t]o avoid being a conspirator is to be innocent of conspiracy." *Kehm*, 799 F.2d at 362. While it can be fair to infer that a drug

---

[6] Plaintiffs accuse Deutsche Bank of "misstat[ing] . . . the nature of its conspiracy." Opp. 12. Deutsche Bank just quoted *the Complaint*'s description of a "conspiracy to provide material support." Mem. 16 (quoting Compl. ¶ 240). To succeed, Plaintiffs must plead an agreement to commit *that* offense. Plaintiffs' reference to the offense of "concealing" material support for terrorism (Opp. 15) also adds nothing ; just as there is no allegation of an intentional agreement to fund terrorists, neither is there an allegation of an agreement to conceal such funding.

mule has tacitly agreed to a conspiracy to traffic drugs, it cannot be maintained that non-transparent banking practices manifest an intent to conspire in the murder of U.S. soldiers.[7]

The "obvious alternative explanation," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007), and the one actually supported by the Consent Order, is that some Deutsche Bank employees sought to increase the bank's business by engaging in non-transparent banking involving sanctioned countries. Compl. Ex. A ¶ 1. It is not "shameless[]" to recite the actual motive found by a government regulator. Opp. 4. What is improper is to spin the facts of this case into a claim that a global banking business intentionally entered a terror-funding conspiracy. That misdirects the opprobrium Congress has reserved for the true perpetrators of terrorism.

## III. Plaintiffs Read The Objective Terroristic Intent Requirement Out Of The ATA.

Plaintiffs do not dispute that Deutsche Bank's non-transparent processing of transactions for Iranian banks cannot be an "act of international terrorism" unless it appears to be intended to achieve a terrorist purpose (*e.g.*, to intimidate civilians or coerce a government). 18 U.S.C. § 2331(1)(B). But their argument does not take that requirement seriously. Plaintiffs rely on *Boim* (Opp. 19), but that decision does not help them. In *Boim*, the Seventh Circuit recognized that donations made to a wholly illegitimate terrorist organization such as Hamas supports an objective intent to advance terrorist motives. 549 F.3d at 693-94; *see also Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 322 (E.D.N.Y. 2015) (direct services to terrorists). Nothing in *Boim* suggests that the appearance of a terror-funding motive can be inferred from providing dollar-clearing services for the benefit of Iranian banks, which engage in many legitimate transactions.

[7] Indeed, if Deutsche Bank had purposefully agreed to a scheme to fund terrorists, it would have been a remarkably bad conspirator; more than 99% of the non-transparent transactions it processed did not violate sanctions laws, and of the remaining fraction Plaintiffs cannot identify a single dollar resulting in money for terrorists. *Supra* p. 1 & n.1. Moreover, far from finding a conspiracy focused on Iran, regulators did not even identify specific violations of Iran sanctions as distinct from Libya, Syria, Burma, and Sudan sanctions. Compl. Ex. A, at 2. Processing transactions involving Burma would have been an odd component of a conspiracy whose putative object was to fund Hezbollah.

Plaintiffs also have no response to the fact, incorporated in their own Complaint, that a regulator found a different, non-terrorist motive for Deutsche Bank's activities. *See* Mem. 19. The closest comparison to this case is *Stansell v. BGP, Inc.*, 2011 WL 1296881 (M.D. Fla. Mar. 31, 2011), where the allegation of a cash-for-protection arrangement with terrorists "would not lead an objective observer to conclude Defendants intended to achieve any of the results listed in § 2331(1)(B)." *Id.* at *9. Plaintiffs self-servingly label *Stansell* an "outlier" that improperly focused on "subjective" intent. Opp. 20-21 n.19. To the contrary, *Stansell* expressly followed *Boim* and assessed the intent element "as a matter of external appearance." *Stansell*, 2011 WL 1296881, at *9. *Stansell* found that the circumstances of the transaction "contradict[ed]" the conclusory assertion that it was intended to intimidate civilians or coerce governments. *Id.* The same is true here: in light of the facts incorporated in the Complaint, the outlandish argument that Deutsche Bank objectively appears to have harbored terrorist goals is simply implausible.

The cumulative effect of Plaintiffs' arguments is striking. Plaintiffs claim that Deutsche Bank committed an "act of international terrorism" by entering a terror-funding conspiracy. Their theory first requires them to disregard an element of a conspiracy offense (*i.e.*, specific intent). Sidestepping that hurdle, Plaintiffs then argue that this "conspiracy" automatically triggers liability, without inquiry into the objective terroristic intent requirement Congress imposed. Opp. 20. Only through multiple evasions of the elements of their claim can Plaintiffs maintain that a Western financial institution is somehow a "terrorist" liable for treble damages. Deutsche Bank unequivocally condemns the attacks against David Schaefer and Charles James Shaffer, but under the ATA, Plaintiffs' remedy is not against Deutsche Bank.

Dated: August 29, 2016

Respectfully submitted,

/s/ Troy A. Bozarth

Larry E. Hepler, IL #01195603
Troy Bozarth, IL #6236748
HEPLERBROOM LLC
130 N. Main St.
P.O. Box 510
Edwardsville, IL 62025
(618) 656-0184
leh@heplerbroom.com
tab@heplerbroom.com

John E. Hall
David M. Zionts (*Pro Hac Vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., NW
Washington, DC 20001
(202) 662-6000
jhall@cov.com

Mark P. Gimbel (*Pro Hac Vice*)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 841-1000

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF on this 29th day of August, 2016. I also certify that the foregoing document is being served this day on all counsel of record registered to receive electronic Notices of Electronic Filing generated by CM/ECF.

/s/ Troy A. Bozarth