# COVINGTON

BEIJING   BRUSSELS   LONDON   LOS ANGELES
NEW YORK   SAN FRANCISCO   SEOUL
SHANGHAI   SILICON VALLEY   WASHINGTON

**John E. Hall**

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 5104
jhall@cov.com

**By ECF**

February 7, 2017

The Honorable Michael J. Reagan
Chief Judge
United States District Court
for the Southern District of Illinois
750 Missouri Avenue
East St. Louis, IL 62201

> Re:  *Shaffer v. Deutsche Bank AG*, No. 16-497-MJR-SCW, Notice
>       of New Authority

Dear Chief Judge Reagan:

I write on behalf of Defendant Deutsche Bank AG ("Deutsche Bank") to bring to the Court's attention new authority supporting Deutsche Bank's motion to dismiss (ECF No. 35). On January 27, 2017, Judge Bates of the U.S. District Court for the District of Columbia issued a decision dismissing claims under the Anti-Terrorism Act ("ATA") by victims of the 1998 U.S. embassy terrorist bombings. *Owens v. BNP Paribas S.A.*, No. 15-1945.

The defendants were sued after pleading guilty to criminal sanctions violations with respect to Sudan and other countries.  Op. 4.  The plaintiffs claimed the banks were liable under the ATA for processing financial transactions for Sudan, a state-sponsor of terrorism, including sanctioned Sudanese banks.  *Id.*

The district court rejected these claims.  The court held that the plaintiffs had not adequately alleged a "predicate act of international terrorism" under 18 U.S.C. § 2339A or § 2339B.  Op. 23.  It reasoned that "[p]rocessing funds for Sudan is not the same as processing funds for a terrorist organization or a terrorist front."  Op. 22.  Plaintiffs could not survive a motion to dismiss by "merely alleg[ing] that it was 'foreseeable' that if defendants processed transactions for Sudan, Sudan *might* give *some* of that money to al Qaeda."  Op. 22-23.  Nor had they adequately alleged a conspiracy "with Sudan to provide financial services to al Qaeda," because there was no factual allegation that the banks "ever agreed to provide funds to al Qaeda."  Op. 22.

The district court also held that proximate causation was not established, for similar reasons.  Relying on *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), the court held that plaintiffs failed to plead that the banks "provided money to a terrorist group," or "that the money [the banks] processed for Sudan was transferred to al Qaeda."  Op. 23.

**COVINGTON**

The Honorable Michael J. Reagan
February 7, 2017
Page 2

*Owens* bolsters and confirms the grounds for dismissal in this case.  As in *Owens*, Plaintiffs plead only that it was "foreseeable" that funds processed for state-owned banks could be used to support terrorism, and do not allege any agreement to provide funds to terrorists. Also as in *Owens*, proximate causation is not established because there is no allegation that the funds Deutsche Bank processed were actually transferred to terrorists.[1]

Respectfully submitted,

*/s/ John E. Hall*
John E. Hall

Attachment

cc: Counsel of Record (by ECF)

---

[1] The Justice Against Sponsors of Terrorism Act ("JASTA") did not apply to the attacks in *Owens*, so *Owens* does not directly address Plaintiff's claim for secondary liability based on JASTA.  As Deutsche Bank has explained (ECF No. 53), Plaintiffs cannot meet the specific requirements Congress imposed for a claim of secondary liability under JASTA.  Consequently, they can only prevail if they can establish that Deutsche Bank committed the "act of international terrorism" of conspiring to provide material support for terrorists, and that this action proximately caused the specified attacks in Iraq.  *Owens* provides additional support for the conclusion that Plaintiffs have failed to plead such a claim.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAMES OWENS, et al.,

     Plaintiffs,

      v.

BNP PARIBAS S.A., et al.,

     Defendants.

Civil Action No. 15-1945 (JDB)

## MEMORANDUM OPINION

Plaintiffs in this case are victims and family members of victims of the 1998 terrorist bombings of the U.S. embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, which killed over two hundred people and injured thousands more. The attacks were carried out by al Qaeda, with the assistance of the Republic of Sudan, which provided safe harbor to al Qaeda throughout the mid-1990s, as well as financial, military, and intelligence assistance. See Owens v. Republic of Sudan, 826 F. Supp. 2d 128 (D.D.C. 2011) (detailing findings of fact and conclusions of law as to Iran's and Sudan's liability for the bombings). Plaintiffs have already sought and won judgment against Iran and Sudan for their roles in the bombings, in a lengthy litigation that began in 2001 and was subsequently expanded into multiple cases against Iran and Sudan. See Owens v. Republic of Sudan, 174 F. Supp. 3d 242, 250–53 (D.D.C. 2016) (discussing the history of plaintiffs' litigation against Sudan); Mem. Op. of March 28, 2014, at 3, Owens v. Republic of Sudan, No. 01-cv-2244(JDB) (D.D.C. Mar. 28, 2014) [ECF No. 300] (awarding damages to plaintiffs); Khaliq v. Republic of Sudan, 33 F. Supp. 3d 29, 32 (D.D.C. 2014) (same). They now bring suit against defendant banks BNP Paribas, S.A., BNP North America, Inc., and BNP Paribas Suisse, S.A. (collectively, "BNPP") under the civil liability provision of the Anti-Terrorism Act

1

("ATA"), 18 U.S.C. § 2333, and various states' tort laws, for allegedly aiding and abetting Sudan's role in the bombings.   BNPP has moved to dismiss, Mot. to Dismiss [ECF No. 17], and plaintiffs have filed a motion for summary judgment [ECF No. 22].   The Court has jurisdiction under 28 U.S.C. §§ 1331, 1367, and 18 U.S.C. § 2333(a).   For the reasons discussed herein, defendants' motion will be granted, and plaintiffs' motion for summary judgment will be denied.[1]

# I.   BACKGROUND

The following facts are taken from [12] plaintiffs' amended complaint.   The plaintiffs in this case are all U.S. nationals injured in the 1998 embassy bombings, or the estates, heirs, or survivors of U.S. nationals who died as a result of the bombings.   Am. Compl. ¶¶ 22–26.   Plaintiffs were awarded judgments against Sudan for its role in the bombings in a previous litigation.   Am. Compl. ¶¶ 24, 27.   The defendants are banks who, according to the complaint, circumvented U.S. sanctions imposed on Sudanese banks and financial institutions by processing financial transactions for these sanctioned entities, thereby enabling Sudan, al Qaeda, and Hezbollah to obtain funds needed to carry out the embassy attacks.   Am. Compl. ¶¶ 15–16.   All three defendant banks conduct business in the United States or have operations here.   BNP Paribas Suisse and BNP North America are both wholly owned subsidiaries of BNP Paribas.   Am. Compl. ¶¶ 29–40.

## A.   SUDAN, AL QAEDA, AND THE EMBASSY BOMBINGS

Sudan was designated as a state-sponsor of terrorism in 1993, and has maintained that designation ever since.   Am. Compl. ¶ 47.   In 1993, a report produced by the U.S. Department of State noted that Sudan actively harbored international terrorist groups, had close ties to Iran, and frequently provided meeting locations, transit points, and safe havens for "Iran-backed extremist

---

[1] Plaintiffs also filed a motion for judicial notice [ECF No. 34] asking the Court to take judicial notice of its March 28, 2014 Memorandum Opinions in the litigation against Iran and Sudan.   That motion will be denied as moot.

groups."  Am. Compl. ¶ 61.  At some point in the early 1990s, Sudan invited al Qaeda, then led by

Osama bin Laden, to relocate from Afghanistan to Sudan, and al Qaeda eventually did so.  Am.

Compl. ¶ 104.  Al Qaeda is an international terrorist network founded by bin Laden in the late

1980s, dedicated to ridding Muslim countries of any Western presence or influence and committed

to using violence to accomplish that end.  Am. Compl. ¶ 100.  In 1992, bin Laden issued a fatwa

against the United States, which allowed for the murder of civilians in order to compel the United

States to leave the Middle East.  Am. Compl. ¶ 104.

Sudan and al Qaeda allegedly formed a mutually beneficial relationship, in which Sudan

provided protection and safe harbor from Western intelligence, and a place for al Qaeda militants

to stay, train, and raise funds through various businesses set up in Sudan, and al Qaeda

manufactured or provided weapons and other equipment for Sudanese security forces and invested

in Sudan's economy and infrastructure.  Am. Compl. ¶ 104.  Members of Sudan's ruling political

party, the National Islamic Front, also organized travel documents and provided economic aid to

al Qaeda while it was operating in Sudan.  Am. Compl. ¶ 104.  Al Qaeda was present in Sudan in

1997 and 1998 leading up to the embassy bombings, and according to the complaint, received

significant financial support from Sudan that enabled al Qaeda to plan and carry out the bombings.

Al Qaeda also received financial support from Hezbollah, an Iran-backed terrorist group based in

Lebanon that was likewise present in Sudan at the time with the Sudanese government's blessing.

Am. Compl.  ¶¶ 70, 101, 103.

### B.  U.S. SANCTIONS AGAINST SUDAN AND BNPP

Prior to the embassy bombings, but as a result of Sudan's designation as a state-sponsor of

terrorism, the United States imposed various sanctions against the Sudanese government in the

early 1990s.  These sanctions included restrictions on U.S. foreign assistance to Sudan, a ban on

defense exports and sales, and other financial restrictions. Am. Compl. ¶ 62. In 1997, however, the United States went further, imposing a complete trade embargo on Sudan due to Sudan's continued support for terrorism, which made it unlawful to export goods and services, including financial services, to Sudan without a license from the Treasury Department's Office of Foreign Assets Control ("OFAC"). Am. Compl. ¶¶ 63–66. All U.S. banks and financial institutions were prohibited from processing financial transactions for the government of Sudan, its agencies, instrumentalities, and controlled entities. Am. Compl. ¶ 66. In addition, by January 1998, all of Sudan's national and major commercial banks were designated Specially Designated Nationals ("SDNs") by OFAC.[2] Am. Compl. ¶¶ 67–68.

The complaint alleges that BNPP did not comply with the U.S. sanctions regime against Sudan, and that had it done so, al Qaeda and Hezbollah would not have been able to receive the assistance from Sudan necessary to carry out the embassy bombings. In July 2014, BNPP pled guilty to one count of conspiring to violate the International Emergency Economic Powers Act ("IEEPA") and the Trading with the Enemy Act ("TWEA"), see 50 U.S.C. § 1705.[3] Am. Compl. ¶¶ 73, 75. BNPP admitted to violating U.S. sanctions imposed on Sudan, Cuba, and Iran by conducting and concealing U.S. dollar-denominated transactions on behalf of sanctioned entities associated with those countries. See Am. Compl. ¶ 77; see also BNPP Plea Agreement Statement of Facts ("SOF") [ECF No. 22-7] ¶¶ 14–16. BNPP stipulated in its plea agreement that this conspiracy took place between 2002 and 2012, based on banking relationships BNPP had

---

[2] "Specially Designated National" refers to any individual or entity designated by OFAC as being subject to trade restrictions or sanctions, not necessarily for terrorism related reasons. See 31 C.F.R. § 515.306 & note; 31 C.F.R. ch. 5, app. A (Information Pertaining to the Specially Designated Nationals and Blocked Persons List); see also U.S. Dep't of Treasury, Specially Designated Nationals List, available at https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx.

[3] Section 1705 makes it a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of regulations issued pursuant to IEEPA, which includes U.S. sanctions against Sudan, Iran, and Cuba. 50 U.S.C. § 1705 (a), (c).

established with Sudanese financial institutions as early as 1997. Am. Compl. ¶ 76; SOF ¶¶ 14, 17. Shortly after the imposition of U.S. sanctions in 1997, BNPP agreed to become the sole correspondent bank in Europe for a major Sudanese government bank, which then directed all major commercial banks in Sudan to use BNPP as their primary correspondent bank in Europe. As a result, most major Sudanese banks eventually held U.S. dollar-denominated accounts with BNPP. Am. Compl. ¶ 82; SOF ¶ 19. BNPP had also established relationships with unaffiliated regional satellite banks, located in Africa, Europe, and the Middle East. Am. Compl. ¶ 88; SOF ¶ 23. BNPP eventually used its relationships with these regional satellite banks to facilitate U.S. dollar payments for sanctioned Sudanese banks, using the banks as clearing houses to disguise the transactions with sanctioned entities. BNPP executives also directed BNPP employees to omit any references to Sudan in U.S. dollar payment messages, again to disguise the source of the transaction. Am. Compl. ¶¶ 90–91.

Plaintiffs allege that these sanctions violations arose out of a conspiracy between BNPP and Sudan to move large amounts of money through the U.S. financial system on behalf of al Qaeda and Hezbollah, and that this money was necessary to the planning and perpetration of the U.S. embassy bombings. Plaintiffs allege that BNPP knew that in processing funds for Sudan, some of that money would end up with al Qaeda, and that BNPP therefore intended to provide material support to al Qaeda and Hezbollah in violation of U.S. criminal laws, including 18 U.S.C. §§ 2339A, 2339B, and 2339C, which constituted acts of international terrorism as defined in 18 U.S.C. § 2331(1). Am. Compl. ¶¶ 107, 110, 111, 118, 120, 123, 126, 128–29. Finally, plaintiffs allege that BNPP's actions aided and abetted al Qaeda's acts of international terrorism. Am. Compl. ¶ 130.

## II. DISCUSSION

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This requires a plaintiff to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The Court must take all allegations in the complaint as true, and draw all reasonable inferences in the plaintiffs' favor. See Aktieselskabet AF 21. November 2001 v. Fame Jeans, Inc., 525 F.3d 8, 15 (D.C. Cir. 2008). However, "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s] devoid of further factual enhancement," do not satisfy the pleading standard. Iqbal, 556 U.S. at 678 (internal quotation marks omitted). The Court need not accept legal conclusions or inferences drawn by the plaintiff where those inferences are unsupported by facts alleged in the complaint. Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002).

Here, defendants raise three principal arguments as to why plaintiffs' complaint fails to state a claim and should be dismissed under Federal Rule of Civil Procedure 12(b)(6). They argue that: (1) the complaint fails to adequately allege that defendants caused plaintiffs' injuries; (2) plaintiffs' claims are premised on theories of secondary liability not cognizable under § 2333; and (3) plaintiffs' claims are time-barred. See Mot. to Dismiss [ECF No. 17] at 9. Only the first two arguments will be reached here.

### A.  CIVIL LIABILITY UNDER THE ATA

Before discussing the arguments raised in defendants' motion to dismiss, it is necessary to first briefly outline the statutory framework of the ATA's civil liability provision.  18 U.S.C. § 2333(a) provides that "[a]ny national of the United States injured in his or her person . . . by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor

in any appropriate district court of the United States and shall recover threefold . . . damages."

Thus, on its face, the ATA appears to require three things: (1) injury to a U.S. national, (2) an act

of international terrorism, and (3) causation.  The statute does not contain an express intent

requirement, but courts that have explicitly addressed intent under § 2333 have concluded that the

statute requires some kind of deliberate misconduct by the defendant, i.e., something more than

mere negligence, in light of the treble damages provision; however, "deliberate disregard of the

interests of others," i.e., recklessness, may be sufficient.  Boim v. Holy Land Foundation for Relief

and Development ("Boim III"), 549 F.3d 685, 692–93 (7th Cir. 2008) (en banc) (internal quotation

marks omitted); see also Gill v. Arab Bank, PLC, 893 F. Supp. 2d 474, 503 (E.D.N.Y. 2012);

Wultz v. Islamic Republic of Iran, 755 F. Supp. 2d 1, 42 (D.D.C. 2010); Goldberg v. UBS AG,

660 F. Supp. 2d 410, 428 (E.D.N.Y. 2009).

Discerning the intent element required by the statute becomes complicated by the meaning

of "international terrorism," which is described in a lengthy definition as activities that:

(A) involve violent acts or acts dangerous to human life that are a violation of the
criminal laws of the United States or of any State, or that would be a criminal
violation if committed within the jurisdiction of the United States or of any
State;

(B) appear to be intended–

(i)  to intimidate or coerce a civilian population;

(ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by mass destruction, assassination, or
kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend
national boundaries in terms of the means by which they are accomplished, the persons
they appear intended to intimidate or coerce, or the locale in which their perpetrators
operate or seek asylum . . . .

18 U.S.C. § 2331(1).  The civil liability provision thus incorporates by reference a broad range of

state and federal crimes that may constitute "acts of international terrorism" if a plaintiff can show

both that a defendant committed the criminal violation <u>and</u> that the crime satisfies the additional

criteria listed above.  This means that, while § 2333 itself requires at least reckless conduct,

plaintiffs will also have to show varying levels of scienter depending on the underlying criminal

violation alleged as constituting the requisite "act of international terrorism."  <u>See, e.g.</u>, <u>Gill</u>, 893

F. Supp. 2d at 504; <u>Goldberg</u>, 660 F. Supp. 2d at 427–28.

Of relevance here, the plaintiffs in this case allege that BNPP's conduct violated the

"material support" provisions of the ATA: 18 U.S.C. §§ 2339A, 2339B, and 2339C.  Section

2339A(a) makes it a crime to "provide[ ] material support or resources [to terrorists] . . . knowing

or intending that they are to be used in preparation for, or in carrying out, a violation of" various

criminal statutes that prohibit, for example, the extraterritorial killing of a U.S. national, § 2332(a),

the extraterritorial use of a weapon of mass destruction against a U.S. national, § 2332a(a)(1), or

the extraterritorial bombing of a place of public use, § 2332f(a)(1).  The second material support

provision, § 2339B(a), criminalizes the knowing provision of material support or resources to a

foreign terrorist organization.[4]  Finally, § 2339C(a)(1) makes it a crime to "by any means, directly

or indirectly, unlawfully and willfully provide[ ] or collect[ ] funds . . . with the knowledge that

such funds are to be used" to carry out an act intended to cause death or serious bodily injury,

---

[4] The Court notes that it is the 1996 version of this provision that applies to this case, which made it illegal
to "knowingly provide[ ] material support or resources to a foreign terrorist organization."  18 U.S.C. § 2339B(a)(1)
(1996).  Section 2339B was amended in 2004 to clarify the knowledge requirement, <u>see</u> Intelligence Reform &
Terrorism Prevention Act, Pub. L. No. 108-458, 118 Stat. 3638, 3762–63 (2004), and now specifies that the statute
requires "knowledge that the organization is a designated terrorist organization . . . , that the organization has engaged
or engages in terrorist activity . . . , or that the organization has engaged or engages in terrorism."  18 U.S.C.
§ 2339B(a)(1).  The amendment clarified but did not change the mens rea requirement in § 2339B.  <u>See</u> <u>Linde</u>, 384 F.
Supp. 2d at 587 n.10.

where the purpose of the act "by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act."

The parties here raise two issues of statutory interpretation relevant to the motion to dismiss. First, they disagree as to whether § 2333 provides for aiding and abetting liability. Second, they disagree as to what level of causation the statute requires. The Court will address each issue in turn.[5]

### 1.   Aiding and Abetting Liability

Much ink has already been spilled on the question of secondary liability under the ATA. It is important to recognize that the concept of aiding and abetting under the ATA is distinct from any secondary liability that may be incorporated into § 2333 by virtue of a predicate criminal violation that qualifies as an "act of international terrorism." The material support statutes, §§ 2339A–C, for example, already criminalize the provision of aid to terrorists, and provide for both attempt and conspiracy liability. See e.g., Boim III, 549 F.3d at 691–92 ("Primary liability in the form of material support to terrorism has the character of secondary liability. Through a chain of incorporations by reference, Congress has expressly imposed liability on a class of aiders and abettors."). However, other courts and the litigants here debate whether a plaintiff can recover against a defendant who aided and abetted a violation of the ATA, or conspired to violate the ATA, without having committed an underlying criminal violation. See, e.g., Gill, 893 F. Supp. 2d at 497 ("[D]o federal courts have the power to fashion, pursuant to § 2333(a), the substance of a federal

---

[5] Plaintiffs' complaint is not a model of clarity, and it is unclear from the face of the complaint whether plaintiffs are in fact alleging that defendants aided and abetted a violation of the ATA, or whether plaintiffs have only alleged a primary violation of the ATA. Plaintiffs state in their factual allegations that defendants' actions "constituted aiding and abetting Al Qaeda's and Hezbollah's 'acts of international terrorism' within the meaning of 18 U.S.C. §§ 2331 and 2333," but do not list a claim for a civil aiding and abetting violation. See Am. Compl. ¶ 130. However, because the parties spend considerable time in their briefs debating the availability of civil aiding and abetting liability under § 2333, the Court will assume that plaintiffs have asserted an aiding and abetting claim in their complaint.

common law tort of aiding and abetting a violation of the ATA?  Or must a plaintiff rely solely on the combination of the material support statutes and § 2333(a) to prove direct liability for a defendant's own acts?" (internal citations omitted)).  In this case, the question is whether defendants, who allegedly processed financial transactions for Sudan, can be held liable as aiders and abettors of plaintiffs' injuries because Sudan provided material support to al Qaeda, the ultimate perpetrator of the embassy attacks.

Section 2333 itself is silent on this issue, and there is no general civil aiding and abetting statute that could be read to impose secondary liability, as exists in the criminal context through 18 U.S.C. § 2.  Courts initially split on this question, with a number of early district court opinions, including two from this district, as well as a panel of the Seventh Circuit, concluding that secondary liability was available under the ATA.  See, e.g., Boim v. Quranic Literacy Inst. ("Boim I"), 291 F.3d 1000, 1019–21 (7th Cir. 2002), overruled sub nom. by Boim III, 549 F.3d 685 (7th Cir. 2008) (en banc); Abecassis v. Wyatt, 785 F. Supp. 2d 614, 645–46 (S.D. Tex. 2011) (assuming aiding and abetting liability is available); Wultz, 755 F. Supp. 2d at 56; In re Chiquita Brands Int'l, Inc. Alien Tort Statute and Shareholder Derivative Litig. ("In re Chiquita"), 690 F. Supp. 2d 1296, 1309–10 (S.D. Fla. 2010); Morris v. Khadr, 415 F. Supp. 2d 1323, 1330 (D. Utah 2006); Strauss v. Credit Lyonnais, S.A., 2006 WL 2862704, at *9 (E.D.N.Y. 2006) (assuming the availability of aiding and abetting liability); Linde v. Arab Bank, PLC, 384 F. Supp. 2d 571, 583 (E.D.N.Y. 2005); Burnett v. Al Baraka Inv. & Development Corp., 274 F. Supp. 2d 86, 105–07 (D.D.C. 2003).  However, the Second Circuit and the Seventh Circuit en banc have now concluded the opposite, and since then, the tide seems to have turned against construing the ATA to include civil secondary liability.  See Rothstein v. UBS AG, 708 F.3d 82, 97–98 (2d Cir. 2013) (concluding that the ATA does not incorporate civil liability for aiding and abetting); Boim III, 549 F.3d at 689

(overruling <u>Boim I</u> as to the availability of civil aiding and abetting liability under the ATA); <u>In re Chiquita</u>, 2015 WL 71562, at *4–5 (S.D. Fla. Jan. 6, 2015) (reversing earlier decision permitting secondary liability in light of <u>Rothstein</u>); <u>Abecassis v. Wyatt</u>, 7 F. Supp. 3d 668, 677 (S.D. Tex. 2014) (same); <u>Linde v. Arab Bank, PLC</u>, 944 F. Supp. 2d 215, 216–17 (E.D.N.Y. 2013) (same); <u>see also</u> <u>Gill</u>, 893 F. Supp. 2d at 501–02 (pre-<u>Rothstein</u> case rejecting secondary liability).

Both the Second and Seventh Circuits have concluded that, because Congress did not specifically provide for aiding and abetting liability in the ATA, aiding and abetting liability is not available, relying on the Supreme Court's decision in <u>Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164 (1994).  <u>See</u> <u>Rothstein</u>, 708 F.3d at 97 (citing <u>Central Bank</u>); <u>Boim III</u>, 549 F.3d at 689 (same).  In <u>Central Bank</u>, the Supreme Court held that, despite the "extensive scheme of civil liability" Congress created in the Securities Act of 1933 and the Securities Exchange Act of 1934, 511 U.S. at 171, aiding and abetting liability is not available under § 10(b) of the 1934 Act, "[b]ecause the text of § 10(b) does not prohibit aiding and abetting," <u>id.</u> at 191.  The Court noted that Congress had imposed other forms of secondary liability in other provisions of the Securities Exchange Act, but had excluded aiding and abetting liability in private causes of action, thereby indicating that "[w]hen Congress wished to create such [secondary] liability, it had little trouble doing so." <u>Id.</u> at 184 (alterations in original) (internal quotation marks omitted).

The Supreme Court rejected the argument that "Congress legislated with an understanding of general principles of tort law," and therefore Congress must have "intended to include aiding and abetting liability" in the Securities Exchange Act, pointing out that "Congress has not enacted a general civil aiding and abetting statute." <u>Id.</u> at 180–82 (internal quotation marks omitted). Instead, Congress has taken "a statute-by-statute approach to civil aiding and abetting liability."

Id. at 182.  Therefore, when Congress enacts a private damages action, "there is no general presumption that the plaintiff may also sue aiders and abettors."  Id.; see also Stoneridge Inv. Partners, LLC v. Scientific-Atlantic, Inc., 552 U.S. 148, 158 (2008) (reaffirming Central Bank).  Applying these principles to the ATA, the Second Circuit concluded in Rothstein: "We doubt that Congress, having included in the ATA several express provisions with respect to aiding and abetting in connection with the criminal provisions, can have intended § 2333 to authorize civil liability for aiding and abetting through its silence."  708 F.3d at 98; accord Boim III, 549 F.3d at 689 (concluding that "statutory silence on the subject of secondary liability means there is none").

Those courts that have found aiding and abetting liability under the ATA—several of which have subsequently reversed course—have distinguished Central Bank on essentially two main grounds, which plaintiffs echo here.  See Pl.'s Resp. to Mot. to Dismiss [ECF No. 27] at 14–16.  First, they argue that Central Bank was limited to implied rights of action like § 10(b), while § 2333, in contrast, creates an express right of action.  Therefore, it is said, Central Bank is not necessarily controlling.  See, e.g., Boim I, 291 F.3d at 1019; Wultz, 755 F. Supp. 2d at 55; Linde, 384 F. Supp. 2d at 583.  And second, they point to congressional intent based on § 2333's legislative history.  As the argument goes, Congress intended to incorporate general principles of tort law into the ATA and to "empower[ ] victims [of terrorism] with all the weapons available in civil litigation." 137 Cong. Rec. S4,511 (daily ed. April 16, 1991) (statement of Sen. Grassley), cited in Wultz, 755 F. Supp. 2d at 56.  Likewise, courts cite language in the legislative history indicating that the ATA was intended to impose liability "at any point along the causal chain of terrorism."  See S. Rep. 102-342, at 22 (1992), cited in Boim I, 291 F.3d at 1011, and Wultz, 755 F. Supp. 2d at 56.  To refuse to extend the ATA to civil aiding and abetting liability, plaintiffs argue, would therefore be contrary to Congress's intent.

These arguments in favor of civil aiding and abetting liability are ultimately unpersuasive. To begin with, as several courts have recognized, Central Bank's reasoning was not dependent on any unique feature of implied rights of action, or of the securities laws more generally. See, e.g., Central Bank, 511 U.S. at 199–201 (Stevens, J., dissenting) (criticizing the breadth of the majority's opinion); Boim III, 549 F.3d at 689; Gill, 893 F. Supp. 2d at 500; see also Freeman v. DirecTV, Inc., 457 F.3d 1001, 1006 n.1 (9th Cir. 2006) (noting, in a case involving the Electronic Communications Privacy Act, that "it is the Supreme Court's approach to interpreting the statute [in Central Bank], not the statute itself, that is significant"). To the extent that the Supreme Court remarked on the express/implied distinction at all, it was to observe that Congress had not provided for aiding and abetting liability in any of the express private causes of action in the statute, and therefore it was even less likely that Congress meant to impose aiding and abetting liability in an implied private right of action. Central Bank, 511 U.S. at 183–84. The salient inquiry, then, revolved around the text of the statute—which was silent on the issue of aiding and abetting liability, even though Congress had provided for other forms of secondary liability elsewhere in the statute. Id. at 184.

The Supreme Court in Central Bank, moreover, rejected arguments similar to those raised here by the plaintiffs regarding congressional intent to impose broad liability in light of general principles of American tort law. The Court was clear that "[p]olicy considerations cannot override our interpretation of the text and structure of the Act." Id. at 188. The Court also found that "it is far from clear that Congress . . . would have decided that the statutory purposes would be furthered by the imposition of private aider and abettor liability." Id. at 189–90. Here as well, the legislative history of the ATA is ambiguous at best and does not reflect a consensus as to how broadly the civil liability provision should be interpreted. Some proponents of the bill, for example, appeared

13

to suggest that the civil liability provision would cover <u>negligent</u> conduct, despite the treble damages provision, which is usually an indication of an intentional tort.  <u>See</u> <u>Antiterrorism Act of 1990: Hearing on S.2465 Before the Subcomm. on Courts and Admin. Practice ("Hearing on S.2465")</u>, 101st Cong. 136 (1992) (statement of Joseph A. Morris, former general counsel of the U.S. Info. Agency and the U.S. Office of Pers. Mgmt.) ("The tort law system has similar rules where liability attaches to those who knowingly or negligently make it possible for some actor grievously to injure somebody else.  As section 2333(a) of this bill is drafted, it brings all of that tort law potential into any of these civil suits.").  Others, however, appeared to believe that the provision would focus principally on terrorists and terrorist organizations themselves rather than secondary actors—and therefore would not see much use.  <u>See, e.g.</u>, <u>Hearing on S.2465</u>, 101st Cong. 17 (1992) (statement of Alan J. Kreczko, Deputy Legal Advisor, U.S. Dep't of State) ("It may be that, as a practical matter, there are not very many circumstances in which the law can be employed.  To our knowledge few terrorists are likely to travel to the United States and few terrorist organizations are likely to have cash assets or property in the United States that could be attached and used to fulfill a civil judgment.").  And while there are several statements in the legislative history that frequently refer to "all" American tort law, as the district court in <u>Gill</u> noted, no one to date "appears to have seriously suggested, for example, that section 2333(a) provides for strict liability," which is <u>also</u> a feature of the tort system.  <u>Gill</u>, 893 F. Supp. 2d at 501.  Even the oft-quoted statement by Senator Grassley becomes much less clear when the full statement is considered:

> The ATA removes the jurisdictional hurdles in the courts confronting victims and it empowers victims with all the weapons available in civil litigation, including: subpoenas for financial records, banking information, and shipping receipts—this bill provides victims with the tools necessary to find terrorists' assets and seize them.

137 Cong. Rec. S4,511 (daily ed. Apr. 16, 1991) (statement of Sen. Grassley). In its entirety, then, the statement appears to refer principally to weapons of civil <u>discovery</u>, rather than to civil theories of secondary liability.

In short, the legislative history of the ATA provides little concrete insight into the precise scope of liability contemplated in the civil liability provision. The statutory text is the clearest indicator of the statute's meaning, and the text here is silent as to civil aiding and abetting liability. It is also noteworthy that the <u>criminal</u> provisions of the ATA refer specifically to <u>some</u> forms of secondary liability—some, but not all. Sections 2339A, B, and C, for example, all impose liability for attempt and conspiracy, <u>see</u> §§ 2339A(a), 2339B(a)(1), 2339C(a)(2), but only § 2339B states that there is also jurisdiction over offenses for aiding and abetting, <u>see</u> § 2339B(d)(1)(F). As was the case in <u>Central Bank</u>, this selectiveness suggests that Congress deliberately chose when and to whom to extend secondary liability, and that silence as to civil aiding and abetting liability under § 2333 is therefore significant. Indeed, the fact that Congress just months ago amended the ATA to specifically include aiding and abetting liability, <u>see</u> Justice Against Sponsors of Terrorism Act ("JASTA"), S. 2040, 114th Cong. § 4(a) (2016), further underscores that Congress recognizes the import of its statutory silence and does indeed know how to provide for such liability when it chooses to do so. Unfortunately for the plaintiffs here, this new provision of the ATA does not apply to those injured before September 11, 2001, and hence does not aid them. <u>Id.</u> § 7 (indicating JASTA's effective date).

The Court therefore concludes that the now-previous version of the ATA applicable to this case does not provide for civil aiding and abetting liability under § 2333. To the extent that plaintiffs' claims are based on such a theory, they must be dismissed.

2. <u>Causation</u>

The parties also dispute causation. Section 2333 requires that a plaintiff be injured "by reason of" an act of international terrorism. Defendants argue that this language requires proximate cause, because that is how the phrase "by reason of" has been interpreted in other statutes. Mot. to Dismiss at 11–12. They define proximate cause as requiring a "direct" connection between defendants' conduct and plaintiffs' injuries. Mot. to Dismiss at 11–12 (quoting Rothstein 708 F.3d at 91 ("Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were a substantial factor in the sequence of responsible causation and whose injury was reasonably foreseeable or anticipated as a natural consequence."); Siegel v. SEC, 592 F.3d 147, 159 (D.C. Cir. 2010) ("Proximate causation . . . is normally understood to require a direct relation between conduct alleged and injury asserted.")). Plaintiffs agree that proximate cause is required, but argue for a looser definition of the term than that adopted by the Second Circuit in Rothstein and urged by defendants here, in order to be consistent with Congress's intent to impose broad liability. Plaintiffs instead urge that it is sufficient if their injury was a "reasonably foreseeable result of" defendants' conduct. Pls. Resp. at 8–9 (quoting Boim I, 291 F.3d at 1012; Wultz, 755 F. Supp. 2d at 53 (harm to plaintiffs "might have reasonably been anticipated as a natural consequence of the defendant's actions")).

In Rothstein, the Second Circuit explained that "the 'by reason of' language has a well-understood meaning, as Congress [has] used it in creating private rights of action under RICO [Racketeer Influenced & Corrupt Organizations Act] and the antitrust laws, and it [has] historically been interpreted as requiring proof of proximate cause." Rothstein, 708 F.3d at 95. This language requires "a showing that the defendant's violation not only was a 'but for' cause of [the] injury, but was the proximate cause as well." Id. (quoting Holmes v. Sec. Inv'r Protection Corp., 503

U.S. 258, 267–68 (1992) (interpreting same language in RICO)).  The <u>Rothstein</u> court rejected plaintiffs' allegations that the bank UBS's actions in processing transactions for Iran, a state-sponsor of terrorism, were a proximate cause of the plaintiffs' injuries, because the plaintiffs had failed to allege that UBS was a participant in the attacks that injured the plaintiffs, that it provided money to a terrorist organization, or that the money UBS had processed for Iran had been given to Hamas or Hezbollah.  <u>Id.</u> at 97.

According to the plaintiffs here, the <u>Rothstein</u> court erred in adopting the interpretation of the "by reason of" language used by the Supreme Court in <u>Holmes</u>.  Instead, they point to the Supreme Court's decision in <u>CSX Transportation, Inc. v. McBride</u>, 564 U.S. 685, 688 (2011), which held that a statutory provision in the Federal Employers Liability Act did not incorporate traditional proximate cause standards and instead only required a plaintiff to show a lesser standard of causation.  Plaintiffs argue that <u>CSX Transportation</u> stands for the proposition that, when Congress uses "less legalistic language" of causation, "and the legislative purpose is to loosen constraints on recovery, there is little reason for courts to hark back to stock, judge-made proximate cause formulations."  Pls. Resp. at 6 (quoting <u>CSX Transp.</u>, 564 U.S. at 702–03).  Accordingly, plaintiffs argue that a looser standard of recovery is appropriate under the ATA as well.

Plaintiffs' reliance on <u>CSX Transportation</u> is frankly puzzling.  It dealt with entirely different language of causation than is at issue in the ATA; the statute there required plaintiffs to show that their injuries "result[ed] in whole or in part from" defendants' negligence.  <u>CSX Transp.</u>, 564 U.S. at 688.  <u>Holmes</u>, in contrast, dealt with the same "by reason of" language used in the ATA, albeit in a different statute, RICO.  The Court in <u>Holmes</u> relied on its previous interpretations of this same language in the antitrust statutes to conclude that Congress "used the same words, and we can only assume it intended them to have the same meaning that courts had already given

them." 503 U.S. at 268. Likewise, the Second Circuit in <u>Rothstein</u> reached the same conclusion with respect to the same language used in the ATA: if "Congress had intended to allow recovery upon a showing lower than proximate cause, we think it either would have so stated expressly or would at least have chosen language that had not commonly been interpreted to require proximate cause for the prior 100 years." <u>Rothstein</u>, 708 F.3d at 95. Contrary to what plaintiffs appear to suggest in their response, <u>see</u> Pls. Resp. at 6, <u>CSX Transportation</u> in fact makes no reference to the "by reason of" standard when referring to "less legalistic language" that should be interpreted as requiring a lower standard of causation. This case therefore provides no reason to call into question the holding of <u>Holmes</u> or <u>Rothstein</u>'s subsequent conclusion that the ATA requires a showing of proximate cause. Like the Second Circuit, this Court sees no reason to depart from an interpretation of the "by reason of" language that courts have adopted consistently across several statutes.

Most courts that have addressed the causation requirement under the ATA have likewise agreed that proximate cause is required. <u>See, e.g.</u>, <u>Boim III</u>, 549 F.3d at 691–98; <u>Wultz</u>, 755 F. Supp. 2d at 53; <u>Credit Lyonnais</u>, 2006 WL 2862704, at *17–18; <u>Burnett</u>, 274 F. Supp. 2d at 105. Plaintiffs seem to contend, however, that the <u>Rothstein</u> court adopted a more stringent definition of probable cause under the ATA, requiring a "substantial" or "direct" connection between defendants' conduct and plaintiffs' injuries, whereas other courts have stated that a plaintiff's harm need only be a foreseeable or reasonably anticipated result of a defendant's conduct. <u>See, e.g.</u>, <u>Boim I</u>, 291 F.3d at 1012; <u>Wultz</u>, 755 F. Supp. 2d at 53 (harm to plaintiffs "might have reasonably been anticipated as a natural consequence of the defendant's actions"). But this Court finds nothing to support this contention in the Second Circuit's opinion. <u>See, e.g.</u>, <u>Rothstein</u>, 708 F.3d at 91 (defining proximate cause as requiring that a plaintiffs' injury be "reasonably foreseeable or

anticipated as a natural consequence" (quotations marks and citations omitted)).  To the extent that court stressed the need for a closer connection between the defendants and the plaintiffs' injuries, it is important to remember that <u>Rothstein</u>, unlike most ATA cases, involved actors who were not directly connected to any terrorist organization or to agents of a terrorist organization.  Typically, ATA cases brought against banks deal with those who were processing transactions for a terrorist organization or a terrorist front, the nature of the organization dealing with the bank therefore making it foreseeable that the funds processed would likely be used for acts of terrorist violence. In contrast, the bank defendants in <u>Rothstein</u> had dealt with a truly independent intermediary: Iran. The <u>Rothstein</u> defendants, like the bank defendants here, were thus one step further removed from the acts that caused the plaintiffs' injuries, separated by a sovereign state that was not simply a funnel to provide money to terrorists, but that may well have used the funds processed for any number of legitimate purposes.  Without a more concrete connection to indicate that Iran did or was likely to use the money defendants processed to fund terrorist acts, plaintiffs' injuries were not necessarily a "natural" consequence of defendants' conduct.  Thus, <u>Rothstein</u> merely reflects the application of the ATA's proximate cause standard to a different set of facts, not, as plaintiffs here contend, the application of an entirely different legal standard.

Accordingly, the Court concludes that § 2333 requires a showing of proximate cause, as that term is typically defined.  <u>See, e.g.</u>, <u>Burnett</u>, 274 F. Supp. 2d at 105 ("Proximate cause is defined as a test of whether the injury is the natural and probable consequence of the negligent or wrongful act and ought to have been foreseen in light of the circumstances." (internal quotation marks omitted)) (concluding that "[a]ny terrorist act, including the September 11 attacks, might have been the natural and probable consequence of knowingly and intentionally providing financial support to al Qaeda").

### B. PLAINTIFFS' ALLEGATIONS

Having resolved the issues of statutory interpretation raised by the parties with respect to causation and aiding and abetting liability, the Court now turns to the allegations raised in the complaint, and the claims plaintiffs have asserted.

First, as discussed above in Part II.A.1, to the extent that plaintiffs raise a claim for aiding and abetting a violation of the ATA, this claim is dismissed, as § 2333 does not provide for civil aiding and abetting liability. Second, to the extent that plaintiffs raise a claim for primary liability based on an underlying violation of § 2339C, this claim is also dismissed, as the enactment of § 2339C in 2002 post-dates the relevant conduct here leading up to the 1998 embassy bombings. See Suppression of the Financing of Terrorism Convention Implementation Act of 2002, Pub. L. 107-197, Title II, § 202(a), 116 Stat. 724 (2002) (adding § 2339C); Boim III, 549 F.3d at 691 ("Only because this is a very old case . . . does the 1994 effective date of section 2339A . . . present an obstacle to liability . . . . [The defendant] did not render material support to Hamas between the effective date of section 2339A and Boim's killing, so the judgment against him must be reversed.").

The claims that remain are state law tort claims and ATA claims based on underlying violations of §§ 2339A and 2339B that serve as predicate "act[s] of international terrorism." But there are several problems with the facts as alleged in plaintiffs' complaint. First, most of the facts alleged with respect to defendants' conduct post-date the embassy bombings. Although plaintiffs provide detailed facts regarding defendants' violation of U.S. sanctions against Sudan, most of this conduct took place between 2002 and 2012, at least four years after the August 1998 bombings. Plaintiffs have alleged very few facts with respect to the time period between the imposition of sanctions against Sudan in November 1997 and the August 1998 embassy bombings. Indeed, the

only facts plaintiffs have alleged relative to that time period are that, in 1997, BNPP agreed to become a correspondent bank in Europe for a major Sudanese bank, BNPP established relationships with regional satellite banks, and BNPP eventually—crucially, whether in 1997 or later is not clear—used these relationships to circumvent U.S. sanctions on Sudan.[6]  Am. Compl. ¶¶ 82–83, 90–91.

Even assuming that these facts alone establish that BNPP was illegally processing dollar-denominated transactions for Sudan between 1997 and 1998, this only establishes BNPP's connection to Sudan, not a connection to any terrorist group or terrorist activity prior to August 1998—the latter being necessary to show a predicate violation of § 2339A or § 2339B.  Recall that, in order to show an underlying violation of § 2339A, plaintiffs must plausibly allege that defendants provided financial services to Sudan with the knowledge or intent that the services "are to be used in preparation for, or in carrying out" a terrorist act.  See § 2339A(a).  Likewise, to show a violation of § 2339B, plaintiffs must sufficiently allege that defendants knew they were providing material support to a foreign terrorist organization.  See § 2339B(a)(1).  Here, defendants are accused of providing financial services to Sudan, not to al Qaeda or to any terrorist directly. Thus, in order to satisfy the requirements of §§ 2339A or 2339B, plaintiffs must allege sufficient facts to show either that (1) defendants knew Sudan was acting as an agent of al Qaeda or of an individual terrorist; or (2) that defendants knew the ultimate beneficiaries of the financial services would be a terrorist organization or terrorist.  See, e.g., Goldberg, 660 F. Supp. 2d at 432–33; Credit Lyonnais, 2006 WL 2862704, at *11.  Notwithstanding repeated conclusory statements in the complaint that defendants "conspired" with Sudan to provide financial services to al Qaeda,

---

[6] While the Court need not address the statute of limitations issue in light of the Court's other conclusions, this failing in plaintiffs' complaint is likewise relevant to whether plaintiffs can equitably toll the ATA's statute of limitations.

and that defendants knew the money they processed for Sudan would end up with al Qaeda, plaintiffs have failed to satisfy these statutory requirements for intent by pleading specific, non-conclusory factual allegations.

Plaintiffs present no facts suggesting that Sudan and defendants ever agreed to provide funds to al Qaeda, and no facts showing that defendants knew what Sudan was doing with the funds BNPP processed. Indeed, the extent to which the arrangement between al Qaeda and Sudan was generally known in 1997–98—i.e., such that defendants could reasonably be charged with knowledge of it—is unclear from the complaint. Nor have plaintiffs alleged facts to show that Sudan was acting on al Qaeda's behalf in conducting financial transactions with BNPP. In fact, from plaintiffs' allegations, it appears that Sudan's support to al Qaeda consisted principally of providing safe haven and space to train, and perhaps, assistance with travel documents—it was al Qaeda that appears to have provided cash to Sudan. In other words, plaintiffs present no facts to show that Sudan was using the funds processed by BNPP—or was likely to use any funds provided by BNPP—to support al Qaeda. As the Second Circuit recognized, the fact that money was transferred to or for a state-sponsor of terrorism makes it more likely that the money was used for terrorism than if the transfers had been to a state that was not a sponsor of terrorism. Rothstein, 708 F.3d at 97. "But the fact remains that [Sudan] is a government, and as such it has many legitimate agencies, operations, and programs to fund." Id. Processing funds for Sudan is not the same as processing funds for a terrorist organization or a terrorist front. "Unlike the fronts . . . [Sudan] [is] not merely a funnel of funds to terrorists. [Sudan] [is] a recognized sovereign nation with a variety of responsibilities and pursuing a variety of interests." Abecassis v. Wyatt, 704 F. Supp. 2d 623, 666 (S.D. Tex. 2010). Without more, then, plaintiffs cannot simply equate the transfer of money to Sudan with the transfer of money to al Qaeda. It is not sufficient

to merely allege that it was "foreseeable" that if defendants processed transactions for Sudan, Sudan <u>might</u> give <u>some</u> of that money to al Qaeda.  Such allegations do not satisfy the scienter element required by § 2339A or § 2339B, and therefore cannot serve as a predicate act of international terrorism.

For similar reasons, plaintiffs likewise fail to sufficiently allege that defendants' conduct was the proximate cause of their injuries.  As was true in <u>Rothstein</u>, plaintiffs here present no facts showing, for example, that BNPP provided money to a terrorist group, that the money BNPP processed for Sudan was transferred to al Qaeda, or that Sudan would have been unable to assist al Qaeda without the funds that BNPP processed.  <u>Rothstein</u>, 708 F.3d at 97; <u>see also</u> <u>In re Terrorist Attacks on September 11, 2001</u>, 714 F.3d 118, 124–25 (2d Cir. 2013) (plaintiffs failed to allege that bank proximately caused 9/11 attacks by providing routine financial services to charity organizations alleged to provide funds to terrorist groups); <u>Abecassis</u>, 704 F. Supp. 2d at 666 (plaintiffs failed to allege that kickbacks given to Iraq proximately caused plaintiffs' injuries in a Hamas bombing in Israel).  Based on plaintiffs' allegations, there is simply not enough to sustain a sufficiently direct causal connection between defendants' conduct and the embassy bombings that injured plaintiffs.

Plaintiffs argue, however, that "money is fungible," and that money used for non-terrorist activities frees up other resources that Sudan could have used to support al Qaeda.  Pls. Resp. at 10.  The Supreme Court articulated this concept in <u>Holder v. Humanitarian Law Project</u>, 561 U.S. 1, 31 (2010), discussing Congress's finding upon enacting § 2339B that foreign terrorist organizations are "so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct," <u>id.</u> at 29 (internal quotation marks omitted).  Because of this "taint," any money given to foreign terrorist organizations, even if designated for peaceful

activities, still sufficiently furthers the organization's violent activities so as to warrant a complete prohibition on providing financial support to such an organization. As other courts have noted, however, Congress's findings on this point were specific to foreign terrorist organizations, and did not include state sponsors of terrorism. See Rothstein v. UBS AG, 772 F. Supp. 2d 511, 515–16 (S.D.N.Y. 2011); Abecassis, 785 F. Supp. 2d 614, 642 (S.D. Tex. 2011). And indeed, it seems unlikely that Congress would make such a finding with respect to state sponsors of terrorism, given that certain transactions with state sponsors of terrorism are allowed by law, as long as the appropriate OFAC license is obtained. See 50 U.S.C. app. § 2405(j). Thus, the "money is fungible" argument urged by plaintiffs does not appropriately extend to this context.

As plaintiffs' complaint currently stands, their allegations amount to a "post hoc, ergo propter hoc proposition that would mean that any provider of U.S. currency to a state sponsor of terrorism would be strictly liable for injuries subsequently caused by a terrorist organization associated with that state." Rothstein, 708 F.3d at 96. Section 2333, however, does not impose this kind of liability. Accordingly, because plaintiffs have failed to plausibly allege that the defendant banks had the necessary scienter to support plaintiffs' ATA claims, and because plaintiffs' have failed to allege a sufficient causal connection between the banks' conduct and plaintiffs' injuries, plaintiffs' complaint must be dismissed.

### III. CONCLUSION

For all these reasons, defendants' motion to dismiss the complaint will be GRANTED. A separate order dismissing the complaint has been issued concurrently with this opinion.

_____/s/_____

JOHN D. BATES
United States District Judge

Dated: January 27, 2017